**UNITED STATES of America,**

**v.**

**Mark S. FERBER, Defendant.**

**Crim. No. 95–10338–WGY.**

United States District Court,
D. Massachusetts.

March 14, 1997.

Kathy B. Weinman, Dwyer, Collora & Gertner, Thomas E. Dwyer, Jr., Maria R. Durant, Dwyer & Collora, Boston, MA, for Defendant.

Janice W. Howe, Bingham, Dana & Gould, Boston, MA, for Massachusetts Water Resources Authority.

John E. Wall, Wall & Shaughnessy, Boston, MA, for Merrill Lynch Pierce Fenner & Smith, Inc.

John G. Fabiano, Hale & Dorr, Boston, MA, for Lazard Freres & Co.

David J. Apfel, Brien T. O'Connor, U.S. Attorney's Office, Boston, MA, for U.S.

## MEMORANDUM OF OPINION

YOUNG, District Judge.

### I. *FACTS*

On May 2, 1996, a federal grand jury sitting in this district returned a Second Superseding Indictment (the "Superseding Indictment"), charging Mark S. Ferber ("Ferber") with 39 counts of mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343, and 1346 (Counts 1–39), 13 counts of accepting bribes and unlawful gratuities as an agent of an organization receiving federal funds in violation of 18 U.S.C. § 666(a)(1)(B) (Counts 40–52, "the Bribery Counts"), one count of conspiracy in violation of 18 U.S.C. § 371 (Count 53), 25 counts of using interstate travel to commit bribery, commercial bribery, and extortion in violation of 18 U.S.C. § 1952 (Counts 54–78, "the Travel Act Counts"), and one count of attempted extortion in violation of 18 U.S.C. § 1951 (Count 79).

The government dismissed the conspiracy and attempted extortion counts on the eve of trial but went on to prove the facts summarized below:

Ferber was employed as a financial advisor and investment banker working principally in the area of public finance. During the period covered by the Superseding Indictment, he was employed by four investment banking firms: Kidder, Peabody ("Kidder"), from January 1982 to June 1986; First Boston Corporation, from June 1986 to April 1988; Lazard Freres & Co. ("Lazard"), from April 1988 to February 1993; and First Albany Corporation, from February 1993 to July 1993. At various times from March 1985 to July 1993, Ferber and the firms for which he worked were retained to serve as financial advisors to several government and public agencies, including the Massachusetts Water Resources Authority ("MWRA"), the District of Columbia, the Michigan Department of Transportation ("MDOT"), and the United States Postal Service ("USPS") (collectively the "Public Entity Clients"). In each case, the Public Entity Clients relied primarily on Ferber for financial advice. This role created a fiduciary relationship between Ferber and his Public Entity Clients in that they placed a special trust and confidence in him based upon his knowledge and expertise and expected him to act in their best interests.

Ferber, however, strayed from this obligation of utmost loyalty and fidelity. Ferber was charged, and ultimately convicted, of taking advantage of his special position with the Public Entity Clients for his own personal gain, thereby breaching his fiduciary duty and defrauding those clients.

### A. *The Scheme to Defraud the MWRA*

The MWRA is an authority of the Commonwealth of Massachusetts responsible for providing water and sewer services for approximately 45 Massachusetts cities and towns and, as a result of that responsibility, is also principally responsible for the cleanup of the Boston Harbor. To accomplish these objectives, the MWRA found it necessary to raise billions of dollars, principally by issuing bonds.

In March, 1985, the MWRA retained Kidder as its first financial advisor to assist in executing the financial transactions necessary for its activities. Throughout the MWRA's relationship with Kidder, Ferber was the individual responsible for performing and supervising the advisory services which the MWRA received from Kidder. From March, 1985 to January, 1993, as Ferber moved from one investment banking firm to another, the MWRA formally contracted with those firms and continued to rely on Ferber for financial advisory services. Evidence presented at trial tended to prove that this continuing relationship imposed a fiduciary duty upon Ferber. At trial, the government proved that Ferber secretly violated his duty to the MWRA by putting his own interests above the MWRA's interests, thereby defrauding the MWRA.

The scheme to defraud the MWRA was executed as follows. The MWRA would, from time to time, need to raise capital and would often do so by issuing debt in the form

of bonds to the public. To execute these bond issues efficiently and effectively, the MWRA looked to investment banking firms to act as underwriters and would conduct a selection process by means of an open bid process.

The selection process involved the issuance of a request for qualifications ("RFQ") that consisted of a series of questions bearing on the investment bank's qualifications to serve as an underwriter. The RFQs also contained a provision—called the "blackout rule"—prohibiting participating investment banks from contacting any employee, member, or agent of the MWRA other than its Chief Financial Officer concerning the subject matter of the RFQ. *See, e.g.,* MWRA Request for Qualifications To Participate in Underwriting for the Massachusetts Water Resources Authority, Jan. 5, 1991, Trial Ex. 693, at 14. The investment banks would prepare written responses to the RFQs, hoping to tout their experience and skills in underwriting, thereby retaining a prominent role in the underwriting process.[1] After receiving the written responses to the RFQ, the MWRA selected those investment banks with the best written responses for participation in an oral presentation as part of the final selection process.

Ferber, as financial advisor, played a key role in both drafting the RFQs and preparing the MWRA's selection committee for the oral presentations. The jury found that Ferber exploited his central role in this process on more than one occasion by giving unfair advantage to the investment banking firm of Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") in the selection process. Ferber did this, the government argued and the jury so found, in exchange for certain financial and business advantage he gained or hoped to gain from Merrill Lynch.

Specifically, the government showed that soon after Ferber became financial advisor to the MWRA, he told employees of Wall Street firms that if they wanted to get business with the MWRA, they would have to do favors for him. This conduct escalated when the MWRA decided to issue bonds to pay for various public works projects in 1989. At that time, Ferber met with representatives of Merrill Lynch. Merrill Lynch was very interested in serving as an underwriter for the MWRA bond issue. During the initial meeting, Ferber "requested that Merrill Lynch do him a 'favor' by giving ... Lazard, bonds with defendant Ferber's 'name on them.'" Superseding Indictment ("Sup.Ind.") ¶ 21. In addition, Ferber told Merrill Lynch's representatives that they should have Merrill Lynch clients run debt issues through a finance agency which paid Ferber's firm, Lazard, half of all its underwriting compensation.

The government alleged, and the jury ultimately agreed, that Ferber aided Merrill Lynch during the 1989 underwriter selection process for the MWRA debt issue by providing information to Merrill Lynch in violation of the so called "blackout rule."[2] In March, 1989, the MWRA selected Merrill Lynch as a senior managing underwriter for the bond issue.

In September, 1989, Ferber contacted Merrill Lynch and complained about the lack of business they had sent him after he had put such a "positive spin" on their performance before the MWRA. Two weeks later, a Merrill Lynch representative came to Ferber and explained interest rate swaps in an attempt to persuade Ferber to get the MWRA to conduct swap transactions.[3] Ferber expressed an immediate interest in interest rate swaps and suggested that he could assist

---

1. The bond offerings in question were underwritten by syndicates of banks. There was a distinct hierarchy amongst the underwriters participating in the syndicate. While various terms of art were used to describe the different positions in this hierarchy, suffice it to say that the better an investment bank did in the selection process, the better its position in the syndicate and the higher its commensurate fees.

2. The "blackout rule" was intended to "create a level playing field for all firms competing to participate as underwriters in the upcoming MWRA bond issues." Sup.Ind. ¶ 23.

3. As explained in the Superseding Indictment, "[i]nterest rate swaps are vehicles through which entities exchange (*i.e.,* 'swap') one form of debt for another, *e.g.,* variable rate debt for fixed rate debt." Sup.Ind. ¶ 30.

Merrill Lynch in explaining the transaction to others.

In November, 1989, Merrill Lynch completed an interest rate swap with a development district in Florida. In February, 1990, Merrill Lynch sent Ferber a check for $90,000. Ferber informed Lazard that the money was for work performed on the interest rate swap in Florida. In reality, however, neither Ferber nor any one else at Lazard had done any work whatsoever on that transaction.

In 1990, Ferber recommended that the MWRA participate in interest rate swaps with Merrill Lynch. The MWRA engaged in two interest rate swap transactions which resulted in a fee of over $1.6 million to Merrill Lynch.

On June 26, 1990, Merrill Lynch and Lazard, acting through Ferber, entered into a written contract (the "interest rate swap contract") which called for Lazard's participation in interest rate swaps in return for Merrill Lynch paying Lazard a flat rate of $800,000 for the period of June 26, 1990 to December 31, 1990, in addition to a portion of the compensation earned from the execution of the swaps. The interest rate swap contract was extended for one calendar year on December 1, 1990 and provided for $1,000,000 in periodic payments.[4] While the extended December 1, 1990 contract was in place, Merrill Lynch attempted to terminate the periodic payment under the contract. Ferber, however, told a Merrill Lynch representative that he would "hurt" Merrill Lynch unless the periodic payment was not only renewed, but also increased by $500,000.

In 1992, the MWRA undertook another major bond issue. Once again, Ferber violated the "blackout rule" and provided Merrill Lynch with critical information to aid it in its oral presentation. The MWRA ultimately picked Merrill Lynch as the major underwriter on the issue.

While Ferber was dealing with both the MWRA and Merrill Lynch, he never disclosed his conflict of interest to the MWRA.

Indeed, during the negotiation of the interest rate swap contract, one of Ferber's partners at Lazard expressed reservation and inquired whether the MWRA knew of Ferber's involvement with Merrill Lynch. Ferber responded as follows: "[The] MWRA knew about this deal from the time it was a mere glimmer in Merrill's eye. We have fully disclosed. They had no problem with us on the issue." Tamagni Memorandum, May 27, 1990, Trial Ex. 46.

The problem, however, was that Ferber never fully disclosed his relationship with Merrill Lynch to the MWRA. Indeed, in April, 1992, in a response to an RFQ for financial advisory services from the MWRA, Ferber stated that he had reviewed all current and pending obligations of Lazard and affirmed that there was no potential for conflict of interest or unfair advantage. As a result, Lazard, and specifically Ferber, were again unanimously selected for their financial advisory services in June, 1992. Those services ended, however, when a newspaper article in 1993 exposed Ferber's relationship with Merrill Lynch.

## B. *The Other Public Entity Clients*

The government also charged Ferber with violating his position of public trust by recommending Merrill Lynch interest rate swaps to the District of Columbia. Under Ferber's counsel as a financial advisor from 1991 to 1993, the District of Columbia engaged in several interest rate swap transactions with Merrill Lynch. Merrill Lynch received over $4,000,000 for these transactions. At no time prior to recommending the interest rate swap transactions to the District of Columbia did Ferber ever disclose the interest rate swap contract under which Lazard was compensated by Merrill Lynch.

Ferber also violated his duty as a financial advisor to the State of Michigan. Specifically, in 1992, Ferber guided the MDOT in selecting Merrill Lynch as an underwriter for its bond issue without disclosing his financial relationship to Merrill Lynch under the interest rate swap contract. Indeed, Ferber

---

4. In total, Lazard received approximately $2,550,000 in periodic payments and $3,141,878 in fee splitting payments under the interest rate swap contract. Ferber, as a Lazard partner, received a significant portion of these payments.

certified to the MDOT that there was no conflict of interest in the performance of his financial advisory services.

The final scheme for which Ferber was convicted involved the USPS. In 1990, as a financial advisor, Ferber recommended that the USPS use Merrill Lynch to refinance $250,000,000 in bonds. This recommendation came after the USPS had decided preliminarily to use Goldman Sachs, another underwriting firm. After Ferber's recommendation, however, the USPS used Merrill Lynch. During the time of this bond buy back and refinance, Ferber, through Lazard, was paid over $1.6 million by Merrill Lynch under the interest rate swap contract. Ferber never disclosed his relationship with Merrill Lynch to the USPS.

As may be gleaned from this barebones recital, the trial of this Superseding Indictment was lengthy, involved, and exhaustingly paper intensive. At the close of the government's case, the Court dismissed the Bribery Counts on the ground that the evidence was insufficient to prove that Ferber was an "agent" of an organization receiving federal funds.

On August 9, 1996, the jury convicted Ferber of 57 counts, *i.e.*, the bulk of the mail and wire fraud counts and all of the Travel Act Counts. The jury thus found, by its verdict, that Ferber took advantage of his role as a financial advisor with respect to the Public Entity Clients discussed above. Essentially, Ferber lined his pockets by taking kickbacks from Merrill Lynch in return for recommending their services to his Public Entity Clients. In addition, Ferber failed fully to disclose his relationship with Merrill Lynch to the Public Entity Clients and thus deprived those clients of the ability to make objective and fully informed decisions on issues of public finance.

Following his conviction and while awaiting sentence, Ferber, through his attorneys, engaged in extensive negotiations with the government. The parties reached an agreement whereby the government would waive certain arguments and take certain positions at sentencing, and if the sentence of imprisonment were 37 months or less, Ferber would waive his appellate rights and the government would waive any cross appeal. The government duly performed.

On December 19, 1996, this Court independently sentenced Ferber to thirty three months of imprisonment, two years of supervised released, and a $1,000,000 fine. In reaching this result, the Court rejected certain positions advanced by the government, pursued a sentencing departure analysis to which the government objected, and *sua sponte* dismissed Counts 54–78 of the Superseding Indictment, the Travel Act Counts. Although the parties have agreed not to appeal any aspect of this case, that agreement does not relieve this Court of its professional obligation to explain the reasoning behind its most controversial rulings.

## II. *DISCUSSION*

### A. *Admissibility of Certain Handwritten Notes*

At trial, the government offered certain handwritten notes of Jeffrey Carey ("Carey"), a Merrill Lynch banker who had overall responsibility for preparing Merrill Lynch's written response to the 1991 MWRA RFQ and who also participated in the oral presentation. The notes were written on the back of a typewritten list of questions concerning the MWRA's underwriter selection process that Carey had prepared for his superior, Marsha Eisenberg ("Eisenberg"). Carey testified that he had been instructed to prepare these questions because Eisenberg and Sam Corliss, another Merrill Lynch banker, were meeting with Ferber. He then testified that the handwritten portions of the document were notes of information that Eisenberg had conveyed to him after she had spoken with Ferber. The handwritten comments corresponded with the typewritten questions in such a way as to create an inference that they were answers supplied by Ferber to the questions Carey had prepared for Eisenberg.

After eliciting this testimony, the government moved to admit the handwritten notes

as substantive evidence. Ferber's counsel objected. The government argued that evidence tending to show that Ferber provided Merrill Lynch with substantive information to assist it in the oral examination was relevant to proving the allegations that Ferber had violated the blackout provisions of the 1991 MWRA RFQ. Even so, based upon the foundation that existed when the government first offered this evidence, this Court sustained Ferber's objection and excluded the handwritten notes as hearsay under Fed.R.Evid. 801 and 802.

Later in the trial, the government called Eisenberg as a witness. Eisenberg testified that she did speak with Ferber between the submission of Merrill Lynch's written response to the 1991 MWRA RFQ and the oral presentation about the substance of the oral examination. Eisenberg's memory was "spotty" as to what Ferber had told her concerning Merrill Lynch's oral examination and, while she testified that it would have been her customary practice to talk with Carey after she had spoken with Ferber and prior to the oral examination, she had no specific memory of having done so. Having established this further foundation, the government again offered the handwritten notes as evidence.

The Court received briefs and heard oral argument from both parties outside the hearing of the jury. The government originally argued that Carey's handwritten notes were admissible because they were offered not for the truth of those things asserted in the notes themselves, but rather to prove the existence of the notes. Essentially, the government argued that the notes were offered to show that Ferber had conveyed the information contained therein to Merrill Lynch during the blackout period. This Court reasoned that the government's argument refuted itself. Carey's notes were, in fact, offered for the truth of the matter asserted; namely,

that Eisenberg received information concerning the then upcoming oral portion of the MWRA selection process from Ferber. The relevance of the notes turned entirely on their source, i.e., that the information from Eisenberg came initially from Ferber. Absent that link, the notes were irrelevant. The notes **were** thus offered for the "truths" that Eisenberg accurately recounted and Carey accurately wrote down Ferber's statements. See Fed.R.Evid. 801(c).

The government then retreated to a fall-back position and argued that Carey's notes were admissible under Fed.R.Evid. 803(1) as Eisenberg's present sense impression of Ferber's conversation with her and, in turn, Carey's present sense impression of Eisenberg's conversation with him. This Court, persuaded by that argument, admitted the document in evidence.[5] The Court now explains its rationale.

■ Hearsay is defined by Fed.R.Evid. 801(c) as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." When a hearsay statement has been conveyed through multiple out of court declarants, so called multiple or "totem pole" hearsay, each of the out of court statements must fall within one of the exceptions to the prohibition against the introduction of hearsay. See Fed.R.Evid. 805. Therefore, in order to admit the handwritten notes to prove that Ferber provided Merrill Lynch with information concerning the oral examination, this Court had to find an applicable exception to the rule against hearsay allowing Eisenberg to "report" Ferber's out of court statement and an independent exception allowing Carey's notes to "report" Eisenberg's out of court statements.[6]

■ The first link in the hearsay chain, Ferber's statements to Eisenberg, were admissible when offered against Ferber as admissions by a party-opponent under Fed.

---

5. Still, this Court noted on the record and reaffirms in this opinion that as this decision affected Ferber's substantive rights under Fed.R.Evid. 103(a), it could not constitute harmless error if erroneous.

6. Such multiple hearsay problems are best understood if portrayed diagrammatically.

R.Evid. 801(d)(2)(A).[7] With Ferber's statements to Eisenberg being admissible in their own right, the analysis shifted to Eisenberg's statements to Carey and to Carey's notes of his conversation with her, the second and third links in the hearsay chain.

Rule 803(1) allows the admission of "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter," even if the statement is hearsay and the declarant is available as a witness. Fed.R.Evid. 803(1); *Makuc v. American Honda Motor Co.*, 835 F.2d 389, 391–92 (1st Cir.1987). The rationale for this exception is that the substantial contemporaneity of the statement and the event described or explained offsets the likelihood of deliberate or conscious misrepresentation. Fed.R.Evid. 803(1) advisory committee's note. Also, when the hearsay declarant is available to testify, the possibility of cross-examination provides further reliability. *Id.*

■ A party seeking to invoke the present sense impression exception in a specific case must first satisfy three requirements. First, the declaration must be limited to describing or explaining the event in question. *United States v. Portsmouth Paving Corp.*, 694 F.2d 312, 323 (4th Cir.1982). Second, the statement must be made contemporaneously or immediately after the event described. *Id; see also* McCormick on Evidence § 271, at 214 (John W. Strong ed., 4th ed.1992). Finally, the declarant must have been describing something that she actually perceived herself, though her participation in the event is not required. Fed.R.Evid. 803 advisory committee's note; *see also Portsmouth Paving Corp.*, 694 F.2d at 323. Here, all three requirements were met as to both Eisenberg's statements to Carey and Carey's notes of those statements.

■ The Court inferred, *see* Fed.R.Evid. 104(a), that Eisenberg was sent to Ferber with certain questions to which Carey wanted answers, that she spoke with Ferber to carry out this mission, and that she returned to report to Carey. Carey's handwritten notes were nothing more than a recital of those things Eisenberg said to him. The

Ferber          Eisenberg          Carey

In this diagram, for which I am indebted to Professor Michael H. Graham, Handbook of Federal Evidence § 801.1, Fig. A (4th ed.1996), it was the substance of what Ferber says that was relevant as it was his advice and counselling that violated the blackout rule. Ferber spoke to Eisenberg who, in turn, recounted to Carey what Ferber said to her. Carey, in his turn, wrote down what he was told and authenticated those notes in court. The Ferber statement, thus, "runs through the heads" of Eisenberg and Carey, and their out-of-court declarations were hearsay as they were subject to infirmities of perception and bias that are not subject to cross-examination even though both Eisenberg and Carey were called as witnesses and testified.

7. In the interests of precision, it should be noted that the Federal Rules treat admissions by party-opponents as non-hearsay under Fed.R.Evid. 801(d)(2) rather than as admissible hearsay. Because they are not hearsay, admissions by a party-opponent need not even possess the circumstantial guarantees of trustworthiness normally required of admitted hearsay. McCormick on Evidence § 254, at 141 (John W. Strong ed., 4th ed.1992). This makes practical sense because a party against whom his own statements are offered can hardly complain of the lack of . opportunity to cross-examine himself. *See id.* at 140; Michael H. Graham, Handbook of Federal Evidence § 801.15, at 294 (4th ed.1996).

Nevertheless, an admission by a party-opponent is still generally considered an exception to the prohibition against the use of hearsay evidence. For this reason, an analysis consistent with Fed.R.Evid. 805 was prudent.

level of detail in the answers supported the inference that Eisenberg made the report to Carey with virtual immediacy and that Eisenberg had no conceivable reason to falsify at that time. After all, at the time of this report, Merrill Lynch and Ferber were as thick as thieves. *See* Fed.R.Evid. 801(d)(2)(E). Furthermore, Carey's testimony concerning the nature of his meeting with Eisenberg and the notes themselves demonstrated that they were made either as Eisenberg was telling Carey what transpired in her conversation with Ferber or immediately thereafter. Finally, Eisenberg actually perceived the communication from Ferber, just as Carey actually perceived those things that Eisenberg told him.

It was at this point in the analysis that Ferber challenged the admissibility of the notes. Ferber argued that the present sense impression exception to the hearsay rule cannot apply here because Carey did not participate in, and therefore did not perceive, the conversation between Ferber and Eisenberg. This argument fundamentally misunderstands the analysis. Carey's notes were admissible as a present sense impression, **not** of what Ferber said to Eisenberg, but rather of what **Eisenberg said to Carey.**[8] Because there was a separate and independent basis for admitting each of the links in the hearsay chain that produced Carey's notes, they were admissible. Fed.R.Evid. 805.

### B. *The E–Mail Message*

For much the same reasons, *i.e.,* pursuant to Fed.R.Evid. 803(1), the Court admitted an internal Merrill Lynch E-mail message from Carey to Benjamin Moore ("Moore"), Carey's immediate superior, recounting a conversation with Ferber wherein Ferber inculpated himself. Print out of E-mail message, Sept. 13, 1989, Trial Ex. 417. Carey's E-mail message was printed out as a multi-paragraph document describing a Ferber–Carey telephone conversation. The E-mail message reported that Carey had consulted a co-worker concerning the conversation with Ferber and suggested how Merrill Lynch might deal with Ferber's importunities. The E-mail ended with the observation, "my mind is mush!"

The government first sought admission of the E-mail message as a business record pursuant to Fed.R.Evid. 803(6). To this end, they laid a proper foundation that the print out of the E-mail message was authentic and accurate, and that it was Carey's routine practice to send such E-mail messages to co-workers ii the relevant "loop" immediately following an important telephone conversation with a client. *See* Fed.R.Evid. 406. This Court nevertheless concluded that this foundation was insufficient enough to warrant admission of the E-mail message as a business record.

■ Courts admit hearsay statements which are grouped under Fed.R.Evid. 803 because of the supposed reliability of the out of court statements themselves. *See United States v. Trenkler,* 61 F.3d 45, 58 (1st Cir. 1995). One guarantee of that reliability is that the record was made in the course of a routine business practice. *Kassel v. Gannett Co.,* 875 F.2d 935, 945 (1st Cir.1989). Here, while it may have been Carey's routine business practice to make such records, there was no sufficient evidence that Merrill Lynch required such records to be maintained. This was fatal to the government's proffer on this ground because, in order for a document to be admitted as a business record, there must be some evidence of a business duty to make and regularly maintain records of this type. *See Willco Kuwait (Trading) S.A.K. v. deSavary,* 843 F.2d 618, 628 (1st Cir.1988).

■ Ironically, had it been Carey's practice to make E-mail messages concerning important telephone conversations in the running of his household, for example, admission of this particular E-mail message might have been permissible on a preliminary finding that Carey was the responsible individual for making and maintaining such records. A business record, of course, need not be generated in a "business"; the records of elee-

8. In fact, to accept Ferber's argument that Carey must have perceived Eisenberg's conversation with Ferber would eviscerate the purpose of Fed. R.Evid. 805. If each applicable exception to the hearsay rule had to apply back to the original out of court declarant, then there would almost never be a case of admissible hearsay within hearsay.

mosynary institutions, government agencies, private clubs, and indeed individual households all may properly qualify as business records. *See. e.g., Haskell v. United States Dep't of Agric.*, 930 F.2d 816, 819 (10th Cir. 1991) (records of government agency admissible under 803[6] ); *Keogh v. Commissioner of Internal Revenue*, 713 F.2d 496, 500 (9th Cir.1983) (personal financial diary admissible under 803[6] ). Here, however, Carey was under no business duty to make and maintain these E-mail messages, and the evidence failed to show that Merrill Lynch itself followed such a routine. This particular E-mail message thus did not qualify as a business record pursuant to Fed.R.Evid. 803(6). Were it otherwise, virtually any document found in the files of a business which pertained in any way to the functioning of that business would be admitted willy-nilly as a business record. This is not the law.

The government next pinned their hopes on the immediacy with which Carey composed the E-mail message following his conversation with Ferber and the "my mind is mush!" comment at the end of the message, arguing that the entire message was an excited utterance and thus admissible pursuant to Fed.R.Evid. 803(2). In laying the foundation, the government inquired of Carey concerning the timing of the message (Carey: "I believe I wrote that E-mail shortly, very shortly, after the conversation [with Ferber]"), and Carey's emotional state as a result of that conversation (Carey: "I was very upset, panicked, and very much wanted to get Mr. Moore's attention"). Trial Transcript ("Tr."), May 22, 1996 at 53.

After hearing argument by both sides, the Court ruled:

> I am not going to admit it under [Fed. R.Evid.] 803(2), an excited utterance. Because the detail, the length, the possibility [Carey] spoke to this Kevin before he wrote it, all of it signals to me that whatever he may say about his mind being mush, there's ample time for him to reflect, fabricate.

Tr., May 22, 1996 at 149.

By the time this ruling was made, however, the government had come up with yet a third ground for admission. The government now argued that the E-mail message was a present sense impression, admissible pursuant to Fed.R.Evid. 803(1). The government ultimately prevailed on this argument and the Court admitted the E-mail message in evidence.

■ Upon written reflection, the Court recognizes the possible inconsistency between the finding that "there's ample time for him to reflect, fabricate," which prompted exclusion under Fed.R.Evid. 803(2), and the admissibility ruling under Fed.R.Evid. 803(1), an exception which is likewise grounded on the virtual contemporaneity of the perception with the declaration. *See Portsmouth Paving*, 694 F.2d at 323. Nevertheless, this Court believes that its ruling was consistent with the two rules. An excited utterance must be made under the "stress of excitement," and any amount of time that passes between the exciting event and the statement will remove the declarant from the stress of the situation. Thus, the contemporaneity requirement of Fed.R.Evid. 803(2) "refers to temporal proximity to the 'startling event.'" *Bemis v. Edwards*, 45 F.3d 1369, 1373 n. 1 (9th Cir.1995). A present sense impression, in contrast, is admissible so long as it explains an event immediately after it happens. Courts have recognized that the passage of a short amount of time will not preclude evidence otherwise admissible under Fed.R.Evid. 803(1). See *United States v. Blakey*, 607 F.2d 779, 785 (7th Cir.1979) (statements made within 23 minutes of event admissible under Rule 803[1] ); *Miller v. Crown Amusements, Inc.*, 821 F.Supp. 703, 706–07 (S.D.Ga.1993) (statements made within 10 minutes of event admissible under Rule 803[1] ); *see also* Fed. R.Evid. 803(1) advisory committee's note (under Rule 803(1) "in many, if not most, instances precise contemporaneity is not possible and hence a slight lapse [of time] is allowable."). Thus, although Carey's E-mail was removed from the "stress" of the Ferber phone call, it was prepared shortly afterward and therefore qualified as a present sense impression. *See* Fed.R.Evid. 803(1).[9]

9. In addition, there was one other distinguishing feature which led the Court to ground the admis-

## C. Dismissal of the 18 U.S.C. § 666 Counts

At the completion of the government's case, Ferber moved for judgment of acquittal under Fed.R.Crim.P. 29 on each of the counts of the Superseding Indictment. While this Court found Ferber's arguments as to the majority of the counts against him unpersuasive, this Court did dismiss those counts alleging a violation of 18 U.S.C. § 666(a), the Bribery Counts.

Counts 40–52 of the Superseding Indictment alleged that Ferber violated 18 U.S.C. § 666(a) by soliciting and accepting payments from Merrill Lynch in return for his influence in connection with Merrill Lynch's business with the MWRA, the District of Columbia, and the MDOT. Section 666(a) prohibits any person who serves as an agent of an organization or local, state, or tribal government that receives benefits in excess of $10,000 under a federal program from corruptly soliciting, accepting, or agreeing to accept anything of value in exchange for influence or reward in connection with any business of that organization. 18 U.S.C. § 666(a). For the jury to convict Ferber of a violation of section 666, therefore, the government had to prove was that Ferber was an "agent" of the MWRA, the District of Columbia, and the MDOT.

■ Section 666 defines an agent as "a person authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner director, officer, manager, and representative." 18 U.S.C. § 666(d)(1). In this case, because Ferber was neither a servant, employee, partner, director, officer, manager nor representative of any of the Public Entity Clients, the government had to prove that he was "a person ·authorized to act on [their] behalf." To determine whether the government had

presented sufficient evidence of such a relationship, this Court looked to general principles of agency law. *See United States v. Toro,* No. 89 CR 0268(RWS), 1989 WL 63118, at *1–2 (S.D.N.Y. June 8, 1989); *United States v. Wyncoop,* 789 F.Supp. 345, 347 (D.Or.1992), *rev'd on other grounds,* 11 F.3d 119 (9th Cir.1993). Generally, an agency relationship is characterized by three essential characteristics: 1) the power of the agent to alter the legal relationships between the principal and third parties and the principal and the agent herself; 2) the right of the principal to control the agent concerning matters within the scope of the agency; and 3) the existence of a fiduciary obligation owed by the agent to the principal with respect to matters within the scope of the agency. *Sabel v. Mead Johnson & Co.,* 737 F.Supp. 135, 138 (D.Mass.1990) (citing Restatement [Second] of Agency §§ 12–14 [1958] ).

■ The government's evidence demonstrated the existence of only one of these three factors. There was evidence sufficient for a jury to conclude that Ferber owed a fiduciary obligation to the Public Entity Clients. The government's evidence, however, consistently showed that Ferber's role was solely advisory in nature. Ferber provided his clients with debt financing and financial planning advice. There was no evidence presented in the government's case that tended to show that Ferber was ever given the authority to alter the legal relationship between the Public Entity Clients and third parties. While Ferber often made suggestions or recommendations concerning various courses of action, the power to actually act on those decisions was retained by the Public Entity Clients themselves.[10] Nor was there any evidence presented during the case-in-chief that Ferber's Public Entity Clients controlled the means by which he provided his financial advisory services. *Cf.*

sion on the exception for present sense impression rather than upon the claimed excited utterance. The E-mail message urged Moore to speak directly with Ferber thus giving Moore the opportunity to confirm Ferber's importunities. The apparent ability to verify the information given by Carey tips the scale in favor of Carey's reliability and, notwithstanding the abatement of the

excitement, warrants admission under Fed. R.Evid. 803(1).

**10.** Ironically, the defense proffered a sweeping affirmative exposition of Ferber's conduct, replete with numerous instances where Ferber purported to act for, and alter the legal relationships of, his Public Entity Clients with third parties.

*United States v. Tianello,* 860 F.Supp. 1521, 1524 (M.D.Fla.1994) (holding that defendant was not an agent because alleged principal did not control means by which the defendants accomplished their duties). For these reasons, this Court concluded that Ferber was not the agent of his Public Entity Clients for purposes of section 666 and accordingly dismissed the Bribery Counts. *See United States v. Olbres,* 61 F.3d 967, 970 (1st Cir. 1995) (citing *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 [1979] ), *cert. denied,* —— U.S. ——, 116 S.Ct. 522, 133 L.Ed.2d 430 (1995).

### D. *The Travel Act Counts*

The Superseding Indictment charged Ferber with violating the Travel Act by soliciting and receiving illegal gratuities under Mass. Gen.L. ch. 268A, § 3(b) and committing acts of commercial bribery in violation of Mass. Gen.L. ch. 271, § 39(a)(2).[11] The jury convicted Ferber of all the charged Travel Act Counts predicated on violations of the Massachusetts gratuity statute, Mass.Gen.L. ch. 268A, § 3. Prior to sentencing, however, this Court, *sua sponte,* dismissed those counts for the reasons discussed herein.

The Travel Act provides as follows:

(a) Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to—

(1) distribute the proceeds of any unlawful activity; or . . .

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

. . . shall be fined under this title, imprisoned not more than 5 years, or both . . .

(b) As used in this section (i) 'unlawful activity' means . . .

(2) *extortion, bribery. or arson in violation of the laws of the State* in which committed or of the United States. . . .

18 U.S.C. § 1952 (emphasis added). Congress enacted the Travel Act in 1961 as part of Attorney General Robert Kennedy's campaign against organized crime. The original purpose of the Travel Act was to aid states in the enforcement of their laws by cracking down on those avoiding state prosecution by operating their criminal enterprises from outside a state's boundaries. *See Rewis v. United States,* 401 U.S. 808, 811, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971) (citing S.Rep. No. 644, 87th Cong., 1st Sess., 2–3 [1961] ). As a Senate Report endorsing the adoption of the Travel Act stated:

Over the years an ever-increasing portion of our national resources has been diverted into illicit channels. Because many rackets are conducted by highly organized syndicates whose influence extends over State and National borders, *the Federal Government should come to the aid of local law enforcement authorities* in an effort to stem such activity.

*United States v. Nardello,* 393 U.S. 286, 291, 89 S.Ct. 534, 537, 21 L.Ed.2d 487 (1969) (quoting S.Rep. No. 644, 87th Cong., 1st Sess., 4 [1961] ) (emphasis added). Although defined by reference to state law, the Travel Act "was not originally intended to substitute a federal penalty for the underlying state law violation; rather, it was intended to have the defendant face prosecution for both the federal and state charges." Steven G. Shapiro, *White–Collar Crime: Fourth Survey of Law Substantive Crimes, Travel Act,* 24 Am.Crim. L.Rev. 735, 735–36 (1987).

The interplay between the Travel Act and state law has created questions regarding the act's scope and the validity of certain state predicate offenses. A trilogy of Supreme Court cases analyzed the relationship between the Travel Act and state law and

---

**11.** At the close of the government's case, this Court entered a judgment of acquittal under Fed. R.Crim.P. 29 with respect to the Travel Act Counts to the extent they relied on violations of the Massachusetts commercial bribery statute, Mass.Gen.L. ch. 271, § 39(a)(2), as predicate acts. In so doing, this Court concluded—for the

same reasons expressed in the preceding section—that the government had not satisfied its burden of proving, beyond a reasonable doubt, that Ferber was an "agent" within the meaning of the Massachusetts commercial bribery statute of the Public Entity Clients.

provides the proper starting point for this Court's analysis.

The Supreme Court first confronted the scope of the Travel Act in *United States v. Nardello*, 393 U.S. 286, 89 S.Ct. 534, 21 L.Ed.2d 487 (1969). In *Nardello*, the defendants were charged under the Travel Act for their involvement in a " 'shakedown' operation whereby individuals would be lured into a compromising homosexual situation and then threatened with exposure unless [the defendants'] silence was purchased." *Id.* at 287, 89 S.Ct. at 535. The district court dismissed the Travel Act counts on the ground that extortion under Pennsylvania law required the defendants to be public officials and, in this case, they were not. The Supreme Court reversed and held that the relevant "inquiry is not the manner in which States classify their criminal prohibitions but whether the particular State involved prohibits the extortionate activity charged." *Id.* at 295, 89 S.Ct. at 539. In *Nardello*, Pennsylvania law prohibited the conduct charged, but classified it as blackmail. The Court therefore concluded that because the conduct involved was both "generally known as extortionate" and criminal under Pennsylvania's blackmail statute, it was a valid Travel Act predicate. *Id.* at 296, 89 S.Ct. at 539.

Following this expansive reading of the Travel Act's reach to extortionate conduct, the Supreme Court took a narrower view of the statute in *Rewis v. United States*, 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971). In *Rewis*, the defendants operated a gambling business near the Georgia–Florida state line. *Id.* at 810, 91 S.Ct. at 1058. The government's theory of the case was that the defendants violated the Travel Act because bettors crossed stated lines to place bets on a lottery that violated Florida law. *Id.* The Supreme Court reversed the convictions stating that "it cannot be said, with certainty sufficient to justify a criminal conviction, that Congress intended that interstate travel by mere customers of a gambling establishment should violate the Travel Act." *Id.* at 811, 91 S.Ct. at 1059. In reaching its decision, the Court stated that:

*Congress would certainly recognize that an expansive Travel Act would alter sensi-tive federal-state relationships,* could over-extend limited federal police resources, and might well produce situations in which the geographic origin of customers, a matter of happenstance, would transform relatively minor state offenses into federal felonies. It is not for us to weigh the merits of these factors, but the fact that they are even discussed in the legislative history of § 1952 strongly suggests that Congress did not intend that the Travel Act should apply to criminal activity solely because that activity is at times patronized by persons from another State.

*Id.* at 812, 91 S.Ct. at 1059 (emphasis added).

In the final case in this trilogy, *Perrin v. United States*, 444 U.S. 37, 50, 100 S.Ct. 311, 318, 62 L.Ed.2d 199 (1979), the Supreme Court held that bribery for purposes of the Travel Act included commercial bribery. In *Perrin*, the defendants were convicted under the Travel Act for executing a scheme to exploit data obtained from a geological exploration company. *Id.* at 40–41, 100 S.Ct. at 313–14. The defendants argued that commercial bribery, although prohibited by state law, was not the type of "bribery" contemplated by Congress as a predicate act under the Travel Act because it was not common law bribery of a public official. *Id.* at 41, 100 S.Ct. at 313–14. The Supreme Court rejected this argument and held that "bribery," as used in the Travel Act, includes commercial bribery—but only if the state has criminalized such conduct. *Id.* at 50, 100 S.Ct. at 318. The Court stated that "[i]n defining an 'unlawful activity,' Congress has clearly stated its intention to include violations of state as well as federal bribery law." *Id.*

This trilogy of Supreme Court cases establishes several important principles. First, the conduct charged as a predicate Travel Act violation must actually be *criminal* under the laws of the state. *Perrin*, 444 U.S. at 50, 100 S.Ct. at 318; *Nardello*, 393 U.S. at 295, 89 S.Ct. at 539. Second, the label a state affixes to certain conduct is irrelevant so long as that criminal conduct fits within traditional, generic notions of "extortion, bribery or arson." 18 U.S.C. § 1952; *see Nardello*, 393 U.S. at 295, 89 S.Ct. at 539. Third, the Travel Act must not be read so

expansively as to upset the delicate balance between the powers of the federal and state sovereigns. *Rewis,* 401 U.S. at 812, 91 S.Ct. at 1059.

With these general considerations in mind, this Court embarked on analyzing whether the violation of Mass.Gen.L. ch. 268A, § 3(b) alleged in this case could serve as a legitimate predicate Travel Act violation. Specifically, this Court considered whether Ferber's conduct, as charged, constituted "bribery" for purposes of the Travel Act.

The Massachusetts gratuity statute provides in relevant part:

> Whoever, being a present or former state, county or municipal employee or member of the judiciary, or person selected to be such an employee or member of the judiciary, otherwise than as provided by law for the proper discharge of official duty, directly or indirectly, asks, demands, exacts, solicits, seeks, accepts, receives or agrees to receive anything of substantial value for himself for or because of any official act or act within his official responsibility performed or to be performed by him ... shall be punished by a fine of not more than three thousand dollars or by imprisonment for not more than two years, or both.

Mass.Gen.L. ch. 268A, § 3(b).[12] Massachusetts law also prohibits conventional, common law bribery. *See* Mass.Gen. L. ch. 268A, § 2.[13] The primary distinction between a gratuity offense under section three and a bribery offense under section two is that bribery requires a corrupt intent to give something of value in exchange for specific influence. *See Commonwealth v. Dutney,* 4 Mass.App.Ct. 363, 375, 348 N.E.2d 812 (1976). A gratuity violation, on the other hand, requires only that something of value

is received "for or because of any official act ... performed or to be performed." Mass. Gen.L. ch. 268A, § 3(b). The gratuity statute is therefore broad enough to capture conduct that although not technically bribery, amounts to influence peddling.

█ There is no doubt that a violation of the Massachusetts bribery statute is a valid predicate offense under the Travel Act. *United States v. Arruda,* 715 F.2d 671, 681 (1st Cir.1983); *United States v. Hathaway,* 534 F.2d 386, 398 (1st Cir.1976), *cert. denied,* 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976). Section two of Chapter 268A is a traditional bribery statute and is, therefore, the type of state statute which Congress contemplated would form a predicate offense under the Travel Act. Had Ferber committed a section two violation, this Court easily could have sentenced Ferber with respect to the Travel Act Counts. Ferber, however, was charged with violating the gratuity provision.

The First Circuit in *United States v. Sawyer,* 85 F.3d 713, 741 (1st Cir.1996) (Stahl, J.) recognized that a violation of the Massachusetts gratuity statute may conceivably serve as the predicate act of bribery for the purposes of the Travel Act. This Court recognizes that holding as the law of this circuit. The First Circuit in *Sawyer,* however, had no occasion to address the situation presented in this case.

█ As the *Sawyer* court stated, "[t]he fact that a gratuity violation involving an intent to influence is essentially bribery, does not mean that every possible application of a gratuity statute fits the rubric." *Id.* at 741 n. 28 (internal citation omitted). Indeed the First Circuit stated that:

> It is not clear whether the government would contend that a gratuity violation in-

---

12. Chapter 268A defines a state employee as "a person performing services for or holding an office, position, employment, or membership in a state agency ..." Mass. Gen.L. ch. 268A, § 1(q). Lazard fits within this definition as it had contracted to perform services for the state. Ferber was the Lazard partner entrusted with actually performing those services. Arguably then, Ferber could be considered a "state employee" under Mass.Gen.L. ch. 268A, § 1(q), though it is a stretch.

13. Mass.Gen.L. ch. 268A, § 2(b) provides:

> Whoever, being a state, county or municipal employee or a member of the judiciary ... directly or indirectly, corruptly asks, demands, exacts, solicits, seeks, accepts, receives or agrees to receive anything of value for himself or for any other person or entity, in return for ... being influenced in his performance of any official act or any act within his official responsibility ...

volving only a reward for an official act (even without any intent to influence any future official act) could constitute "bribery" for purposes of the Travel Act. We are extremely doubtful whether this would constitute bribery for these purposes and do not read the Second Circuit as ruling on this point in *United States v. Biaggi*, 853 F.2d 89, 100–02 (2d Cir.1988), *cert. denied*, 489 U.S. 1052, 109 S.Ct. 1312, 103 L.Ed.2d 581 (1989).

*Sawyer*, 85 F.3d at 741 n. 28. Thus, although *Sawyer* holds that a section three gratuity violation may serve as a predicate act of bribery under the Travel Act, it also serves as a warning that a gratuity violation does not always constitute "bribery" for purposes of the Travel Act.

In discussing the interplay between the Travel Act and the Massachusetts gratuity statute, the First Circuit made explicit reference to the Second Circuit's decision in *United States v. Biaggi*, 853 F.2d 89, 100–02 (2d Cir.1988), *cert. denied*, 489 U.S. 1052, 109 S.Ct. 1312, 103 L.Ed.2d 581 (1989). In *Biaggi*, the defendant, a congressman, was convicted of violating the federal gratuity statute, 18 U.S.C. § 201(g),[14] and the Travel Act. The defendant challenged the Travel Act conviction on the grounds that a federal gratuity violation could not form a predicate offense for a Travel Act conviction because it was not "bribery" within the meaning of the Travel Act. The Second Circuit rejected this challenge and held that the term "bribery" for purposes of the Travel Act included federal gratuity offenses despite the fact that they are inherently less serious than traditional bribery. *Id.* at 102. Quoting the district court's opinion, *United States v. Biaggi*, 674 F.Supp. 86, 89 (E.D.N.Y.1987), the Second Circuit stated that:

> There is no reason to infer that the policy and purpose behind the "corrupt intent to influence" offenses [are] substantially different from [those] underlying the "for or because of" offenses. All sections of the [federal] bribery statute are aimed at preventing the evil of allowing citizens with money to buy better public service than those without money ... "[e]ven if corruption is not intended by either the donor or the donee, there is still a tendency in such a situation to provide conscious preferential treatment of the donor by the donee, or the inefficient management of public affairs."

*Biaggi*, 853 F.2d at 101 (quoting *United States v. Evans*, 572 F.2d 455, 480 (5th Cir.), *cert. denied*, 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182 [1978]). Thus, the Second Circuit concluded that the "policy, evolution, and the legislative history" of the federal gratuity statute—which is grouped in a "compilation of bribery offenses" within the United States Code—indicated that Congress intended a violation of the gratuity statute "to constitute a 'bribery' offense within the meaning of [the Travel Act]." *Biaggi*, 853 F.2d at 102.

*Biaggi*, as the First Circuit noted in *Sawyer*, is instructive, but not dispositive, with respect to the types of gratuity violations which constitute "bribery" under the Travel Act. *Biaggi*, by implication, seems to suggest that all violations of the federal gratuity statute are predicate acts under the Travel Act. *See id.* The significance of *Biaggi* is limited, however, because the Second Circuit was interpreting the **federal** gratuity statute as it applied to a **federal** elected official. As *Biaggi* did not implicate a state interest, there was little concern that an "expansive Travel Act would alter sensitive federal-state relationships." *See Rewis*, 401 U.S. at 812, 91 S.Ct. at 1059. If the federal government chooses to pursue an expansive application of the federal gratuity statute, as was the case in *Biaggi*, it is well within its authority and discretion. It is an altogether different situ-

---

**14.** The federal gratuity statute, 18 U.S.C. § 201(g), is contained in section 201 of the United States Code, entitled "Bribery of public officials and witnesses." Section 201 contains both the federal bribery and federal gratuity statute. The federal gratuity statute, which is very similar to the Massachusetts gratuity statute, states:

> Whoever, being a public official ... otherwise than as provided by law for the proper dis-

charge of official duty, directly or indirectly asks, demands, exacts, solicits, seeks, accepts, receives, or agrees to receive anything of value for himself or because of any official act performed or to be performed by him ... [s]hall be fined not more than $10,000 or imprisoned for not more than two years, or both. 18 U.S.C. § 201(g).

ation, however, where, as here, the federal government seeks to expand the application of a state gratuity statute.[15]

In order to decide whether the alleged violation of the Massachusetts gratuity statute was a valid predicate offense in this case, therefore, this Court analyzed the criminal scope of the Massachusetts statute. In making this determination, this Court looked to the application given to section 3 by the only entities within the Commonwealth of Massachusetts given the policy making authority to define its criminal limits—the prosecutors, see Mass.Gen.L. ch. 12, §§ 3, 27; *Manning v. Municipal Court of the Roxbury District*, 372 Mass. 315, 317–18, 361 N.E.2d 1274 (1977), and the Massachusetts judiciary, *see* Mass. Const. pt. 1, art. 29. After searching Massachusetts case law, this Court concluded that the gratuity statute has never been, in the criminal context, interpreted by the appropriate Commonwealth officials to reach as far as the federal government sought to extend it in this case.

Every reported Massachusetts case dealing with section three involves a **public official** receiving something of substantial value for influence in an area where that official had **actual decision making authority.** *See Commonwealth v. Jarabek*, 384 Mass. 293, 294, 424 N.E.2d 491 (1981) (elected member of school committee charged with violating sections two and three for soliciting payment to reelection campaign in return for maintaining contract); *Commonwealth v. Canon*, 373 Mass. 494, 495, 368 N.E.2d 1181 (1977), *cert. denied*, 435 U.S. 933, 98 S.Ct. 1510, 55 L.Ed.2d 531 (1978) (city engineer of Marlborough charged with violating section three for purchasing land at discount, obtaining apartment permit, and reselling at more the double the purchase price); *Commonwealth v. Burke*, 20 Mass.App.Ct. 489, 492, 481 N.E.2d 494, *rev. denied*, 396 Mass. 1101, 484 N.E.2d 102 (1985) (county commissioner and county

dog officer charged with section three violation for soliciting campaign contributions in return for awarding contracts); *Commonwealth v. Qualter*, 19 Mass.App.Ct. 970, 974, 473 N.E.2d 729 (1985) (city tenant selector charged under section three for receiving payments in return for awarding apartments); *Dutney*, 4 Mass.App.Ct. at 375, 348 N.E.2d 812 (member of board of selectmen charged under section two and section three for accepting money in exchange for issuing liquor licenses); *Commonwealth v. Famigletti*, 4 Mass.App.Ct. 584, 584, 354 N.E.2d 890 (1976) (superintendent of cemetery department charged under section three for receiving $50 in order to move remains from one lot to another). In contrast to the officials in the above mentioned criminal cases, Ferber did not have any actual decision making authority. Lazard was retained by state agencies because of the value placed on Ferber's advice in areas of public finance. Under Massachusetts law, however, the Public Entity Clients retained the ultimate decision making authority and were free to reject his advice.[16]

Although this Court recognized that the plain language of chapter 268A, section three would appear to extend to the conduct in this case, Massachusetts prosecutors have never pursued criminal charges for gratuity violations against anyone similarly situated to Ferber. If conduct such as Ferber's is to be pursued criminally under Mass.Gen.L. ch. 268A, § 3, it is the state, not the federal government, that must make that initial prosecutorial policy decision. The fact that the Commonwealth of Massachusetts has not charged anyone situated as was Ferber with a criminal gratuity violation suggests that the Commonwealth, at least at this point in time, does not view such conduct as a prosecutorial priority.

This view is supported by the fact that Massachusetts has, to a large degree, left

---

**15.** This Court does not reach the question of whether or not the government could have, at least as to the USPS and the District of Columbia, charged Ferber with a predicate violation of the federal gratuity statute. The government did not draft the Indictment in such a manner and this Court may therefore only analyze Mass. Gen.L. ch. 268A, § 3 as the predicate offense.

**16.** This Court does not in any way discount the extent of Ferber's fraud. Ferber occupied a position of trust and he violated that trust. This Court must, however, ensure that defendants are sentenced in accordance with the requirements of the law.

implementation of Mass.Gen.L. ch. 268A, § 3 to the State Ethics Commission (the "Ethics Commission") as a civil regulatory matter. *See* Mass.Gen. L. ch. 268B, § 2 *et seq.* A thorough review of every reported decision citing Mass.Gen.L. ch. 268A, § 3 demonstrates that Ethics Commission decisions under section three far exceed criminal cases. The last reported criminal case under section three was in 1985. *See Burke,* 20 Mass.App. Ct. at 492, 481 N.E.2d 494. In contrast, the Ethics Commission has vigorously pursued section three violations on a regular basis. In fact, the Ethics Commission has applied such a broad interpretation of section 3 that it would likely reach Ferber's conduct. *See, e.g., In Re Louis L. Logan,* Commission Adjudicatory Docket No. 131 (Decision & Order Apr. 28, 1981); *see also* Final Report of the Special Commission on Ethics (introduced as 1997 S. Bill No. 1445 and 1995 H. Bill No. 6172) (proposing broader conflict of interest laws).

In this case, however, the Court found the Ethics Commission's interpretation of section three of little persuasive value. The Ethics Commission is charged only with the civil enforcement of Massachusetts conflict of interest laws. Mass.Gen.L. ch. 268B, § 3. Such civil enforcement serves a very different function than criminal enforcement. Although the pronouncements of the Ethics Commission are entitled to some deference, as the First Circuit stated in *Sawyer,*

> [t]hat deference, however, is tempered not only by the fact that no Massachusetts court has passed on the Ethics Commission's interpretation, but also because this is a criminal case and the Ethics Commission is charged only with civil enforcement. The Commission may very well have valid reasons for adopting a broad, prophylactic interpretation of the statute in its civil dispositions of individual transgressions; its interpretation is easier to prove and the offender is more likely to settle with the Commission if she does not have to admit to more egregious wrongdoing.

*Sawyer,* 85 F.3d at 738. This Court therefore did not rely on the Ethics Commission's interpretation of section three for purposes of determining whether the gratuity offense charged in this case was a valid predicate act under the Travel Act.

As Massachusetts criminal enforcement of section three has never extended to anyone situated as was Ferber, this Court held that Ferber's conduct, as charged under the Massachusetts gratuity statute, did not constitute a valid predicate offense under the Travel Act. The Supreme Court has made it clear that the offense charged as a Travel Act predicate must actually be **criminal** under state law. *See Perrin,* 444 U.S. at 50, 100 S.Ct. at 318; *Nardello,* 393 U.S. at 295, 89 S.Ct. at 539. Here, Massachusetts appears to have made a policy decision not to criminally prosecute section three violators in cases such as the one at bar. In addition, because Congress enacted the Travel Act to aid states in the enforcement of their laws, *Rewis,* 401 U.S. at 811, 91 S.Ct. at 1059, it would be contrary to that purpose for the federal government to attempt to aid Massachusetts in the enforcement of a law which Massachusetts has chosen not to enforce. Applying the Travel Act to the conduct in this case would result in the type of expansive reading of the Travel Act that would upset the delicate balance of power between the state and federal governments. *See Rewis,* 401 U.S. at 812, 91 S.Ct. at 1059.

In reaching this decision, it is worth noting that federal prosecutors should avoid relying on obscure or strained interpretations of state law in order to commence a federal prosecution. It is state, not federal, prosecutors who are charged with deciding the manner in which state criminal laws are to be enforced. *See. e.g., Martin v. Ohio,* 480 U.S. 228, 232, 107 S.Ct. 1098, 1101, 94 L.Ed.2d 267 (1987) (where Court "emphasized the preeminent role of the States in preventing and dealing with crime and the reluctance of the Court to disturb a state's decision with respect to the definition of criminal conduct and the procedures by which the criminal laws are to be enforced in the courts ..."). Congress did not enact the Travel Act to give federal prosecutors a vehicle through which they can expand state laws under the guise of aiding states in the enforcement of their own laws. *See Rewis,* 401 U.S. at 812, 91 S.Ct. at 1059. *But cf.* Dan M. Kahan, *Is*

*Chevron Relevant to Federal Criminal Law?*, 110 Harv.L.Rev. 469, 469–70 (1996) (advocating the development of a federal criminal common law through expansive interpretations by the federal executive). If a state is not enforcing its laws in a particular manner, it is not necessarily asking for help from the federal government.

This Court also notes that this was not a case where corruption within the state government itself was causing the state to look the other way and therefore fail to pursue criminal prosecutions for such conduct. *See United States v. Dadanian*, 818 F.2d 1443, 1448 (9th Cir.1987), *modified on other grounds*, 856 F.2d 1391 (9th Cir.1988) (noting that legislative purpose of statute prohibiting illegal gambling business, 18 U.S.C. § 1955, was "to make it possible for the Federal government to intervene where local and state government have become incapable of law enforcement by reason of ... corruption.") (quoting S.Rep. No. 617, 91st Cong., 74 [1969] ); *see also United States v. Shields*, 793 F.Supp. 768, 778 (N.D.Ill.1991) (Travel Act prosecution of state judges upheld upon showing of "how ineffective state law enforcement has been in policing the Illinois judiciary and how essential federal intervention has been to expose longstanding corruption within this realm"). Massachusetts does enforce its conflict of interest laws.[17] The Ethics Commission is a very visible and important part of state government. In addition, there is not the slightest evidence of any deep seated corruption within the prosecutorial offices of Massachusetts such as to call for federal intervention.

Massachusetts has made a policy judgment on the manner in which it enforces its laws. Federal prosecutors should respect that decision and avoid giving "help" to state law enforcement where that help is neither asked for nor wanted. The problem with Travel Act prosecutions such as this was recently articulated by Judge Woodlock and bears repeating here:

> The federal government has an immense interest in making sure that its judges, its senators, its members of the House of Representatives, its United States Attorneys don't take gratuities. That is a core concern of the federal government, keeping its own house in order. But we return to the question of the degree to which the federal government ought to be cleaning the Augean stables of the Commonwealth of Massachusetts when the potential Hercules involved seem uninterested in the process.

*United States v. Woodward*, Criminal No. 95–10234, Transcript of Sentencing Hearing at 24–25 (D.Mass. Feb. 7, 1997).[18]

### III. Conclusion

For the reasons discussed above, this Court ruled as it did with respect to these matters.

---

**17.** Indeed, a Special Commission on Ethics was formed to investigate, study, and report to the legislature with recommendations for amendments to Massachusetts conflict of interest laws. The final report was completed on June 12, 1995 and the proposed amendments are currently pending before the state legislature. *See* 1997 S.B. No. 1445; 1995 H.B. No. 6172. The report asserts that the state's conflict of interest laws "have been reasonably effective as tools to foster ethical conduct by public employees." Report of Special Commission on Ethics, June 12, 1995, at Executive Summary. Nonetheless, the Special Commission made substantive proposals designed to ensure even greater compliance with Massachusetts ethics laws.

**18.** It is worth noting that, as a practical matter, the Travel Act Counts ultimately made no substantive difference whatsoever in the sentence Ferber received. Under the United States Sentencing Guidelines, the permissible range of Ferber's sentence would have been **exactly** the same had the Travel Act Counts never been brought. *See* Transcript of Sentencing Hearing, December 18, 1996. This Court echoes the concern expressed by Judge Woodlock in the "duplication of what is at the heartland a mail and wire fraud theory by [charges under] the Travel Act." *Woodward*, Transcript of Sentencing Hearing at 31.