**UNITED STATES of America,
Plaintiff–Respondent,**

v.

**F. William SAWYER, Defendant–
Petitioner.**

**No. Cr.A. 96–10312EFH.
No. Civ.A. 99–11603EFH.**

United States District Court,
D. Massachusetts.

Nov. 15, 1999.

John M. Griffin, U.S. Attorney's Office, Boston, MA, for USA, respondent.

Thomas R. Kiley, Cosgrove, Eisenberg & Kiley, Albert F. Cullen, Jr., Law Offices of Albert F. Cullen, Jr., Boston, MA, for F. William Sawyer, defendant.

### MEMORANDUM AND ORDER

HARRINGTON, District Judge.

On November 27, 1996, F. William Sawyer pled guilty to a one-count information charging him with mail fraud in violation of 18 U.S.C. §§ 1341, 1346. He was sentenced to a term of one year of probation and a $5,000 fine. Sawyer now brings this petition for Writ of Error Coram Nobis, seeking to vacate his conviction and expunge his record. *See* 28 U.S.C. § 1651. For the following reasons, the writ is granted, the conviction is vacated, and the record is expunged.

## I. BACKGROUND

### A. Factual History

Between 1986 and 1993, Sawyer was a senior lobbyist with the John Hancock Mutual Life Insurance Company ("Hancock"). At the time, Hancock was the largest life insurance company in Massachusetts, and had an interest in the state insurance laws. Sawyer, employed by Hancock's Government Relations Department, was charged with lobbying the Massachusetts Legislature on behalf of Hancock. As part of his duties, Sawyer was required to communicate with Massachusetts legislators, protect the interests of Hancock, and establish and maintain positive relationships with legislators and industry members.

During this time, Sawyer established relationships with various members of the Massachusetts Legislature. Specifically, Sawyer sought to maintain positive relations with members of the Legislature's Joint Committee on Insurance, composed of state senators and representatives.

While acting as a lobbyist, Sawyer established relations with many of the house members of the Joint Committee on Insurance.[1] In 1990, Sawyer, in various memoranda to Hancock, acknowledged that some bills passed by the Joint Committee were favorable to Hancock.

In an effort to establish positive relationships with Massachusetts legislators, Sawyer paid for their meals, rounds of golf, and other entertainment. These expenditures were treated as business expenses and were reimbursed by Hancock. The head of Hancock's Government Relations Department reviewed and approved Sawyer's expenses on a monthly basis. The prosecution against Sawyer was triggered by a December, 1992 trip to Puerto Rico where Sawyer, other lobbyists, and Massachusetts legislators traveled for a legislative conference.[2]

Sawyer indicated at the time that the expenses were consistent with usual industry practice. Furthermore, Sawyer stated that the expenditures were necessary in order to develop, build, and maintain rela-

tionships with the legislators. During the course of his lobbying efforts, Sawyer caused the mailing of items related to the expenditures on behalf of legislators, including reimbursements for golf.

## B.  Procedural History

On July 7, 1994, a federal grand jury returned an indictment against Sawyer, charging him with various counts of mail fraud, wire fraud, interstate travel with intent to commit bribery, and conspiracy. On November 25, 1994, Sawyer moved to dismiss the charges against him. Sawyer argued, in part, that the government had failed to show or even allege a link between any gratuity given and a specific, identifiable legislative act.[3] The District Court Judge denied the motion. Following the trial, a jury convicted Sawyer of some of these counts. On May 30, 1996, the United States Court of Appeals for the First Circuit vacated the convictions and remanded the case, based upon the District Court's overbroad reading of the law rendered in its jury instructions.[4] In va-

---

1. The Massachusetts Legislature's Joint Committee on Insurance reviews approximately 300 bills each year, about fifty of which affect the life insurance industry. During this time, Massachusetts life insurance companies and lobbyists actively sought the passage of about five bills each year. Sawyer was among those lobbyists who appeared before the Joint Committee on Insurance. *See United States v. Sawyer*, 85 F.3d 713, 720–22 (1st Cir.1996).

2. On the trip, Sawyer paid for many meals, golf, and entertainment, and was reimbursed by Hancock for approximately $4,000 worth of expenses. *See Sawyer*, 85 F.3d at 721.

3. The federal violations were based on the violation of either of two state statutes. *See infra* discussion at Part II. Sawyer moved, before trial, to dismiss all federal counts predicated on violations of Mass.Gen.L. ch. 268A, § 3 because the government had failed to allege any specific official legislative act for which he exchanged gratuities. *See United States v. Sawyer*, 878 F.Supp. 279, 286 (D.Mass.1995). The District Court acknowledged that the government never alleged "such a quid pro quo." *See id.* The District Court, however, did not require the government to prove that "Sawyer gave the alleged

gratuity as a quid pro quo for a specific act." *See id.* at 288.

In arriving at its decision, the District Court examined the analogous federal gratuity statute, 18 U.S.C. § 201(c). The District Court noted that "the majority of federal courts that have addressed the same issue with respect to the closely analogous federal gratuities statute . . . have adopted virtually the same position . . . that the actual performance of some identifiable official act as quid pro quo is not necessary for violation of the gratuity statute." *See Sawyer*, 878 F.Supp. at 288, *citing, United States v. Evans*, 572 F.2d 455, 481–82 (5th Cir.1978); *see also United States v. Standefer*, 610 F.2d 1076, 1080 (3rd Cir.1979). Thus, the District Court held that the government did not have to prove that Sawyer's alleged gratuities were linked to any specific official act. *See id.*

4. The instructions given to the jury by the District Court allowed the jury to find that a violation of either of two state statutes, without more, constituted the deprivation of "honest services" under the federal mail fraud statute. *See Sawyer*, 85 F.3d at 726. In the indictment, the government charged that the federal mail fraud violations were based on

cating Sawyer's original convictions, the First Circuit recognized that this was a "novel" federal mail fraud prosecution, and "that prosecutions on facts like these have not generally been brought." *See United States v. Sawyer*, 85 F.3d 713, 741 (1st Cir.1996).

The First Circuit was "concerned with the close relationship between lobbying activities that are lawful from the standpoint of federal law, even if deplorable, and ... slightly more extreme versions of such conduct that can constitute federal violations." *See id.* at 741. The Court of Appeals was deeply troubled because Sawyer's conduct was "not very different ... from the kind of routine cultivation of friendship." *See id.* Indeed, the First Circuit went on to say that, "[t]he practice of using hospitality, including lavish hospitality, to cultivate business or political relationships is longstanding and pervasive." *Id.* The Circuit Court continued, "if Sawyer had this limited intent—to cultivate friendship rather than to influence an official act—the federal statutes here involved would not be violated." *Id.*

On November 27, 1996, Sawyer appeared before this Court and pled guilty to a one-count information charging him with mail fraud in violation of 18 U.S.C. §§ 1341, 1346 ("the Plea Hearing"). The

government charged that Sawyer had engaged in activity which had deprived the Commonwealth of Massachusetts and its citizens of the right to the honest services of their state legislators, and used the mails in furtherance of this activity. At the Plea Hearing, the government alleged that Sawyer engaged in conduct intended to cause state legislators to violate their duty to the public. In order to establish a violation of the federal mail fraud statute, the government was required to prove that Sawyer had violated Massachusetts law.[5]

At the Plea Hearing before this Court, the government specified that the one-count information was based upon one violation: use of the mails to send a check in the amount of $183.75 in order to reimburse Massachusetts legislators' golf fees. *See Sawyer*, Criminal No. 96–10312(EFH), Plea Hearing at 7. The government specifically stated that Sawyer gave "gratuities" in the form of free golf to state legislators. *See id.* at 6. The government stated that the "gratuities" formed the basis of the charge in Count One of the information. *See id.* at 7. The government contended that these "gratuities" defrauded the Commonwealth of Massachusetts of the right to the honest services of members of the Massachusetts Legislature.[6] *See id.* At

either (1) Mass.Gen.L. ch. 268B, § 6 (the "gift" statute), or (2) Mass.Gen.L. ch. 268A, § 3 (the "gratuity" statute). The jury instructions were improper because they "allowed the jury to equate a ... [state] statute violation with the deprivation of honest services." *See id.* at 729. The Court of Appeals warned that "the jury should not be allowed to slip into the misunderstanding that any violation of proliferating state laws and regulations ... automatically amounts to a federal crime." *See id.* Additionally, in order for federal honest services mail fraud to be proven, a defendant must not only have the intent to affect a legislator's performance of an official act, but the defendant must also have an intent to deceive the public. *See id.* at 732. The First Circuit, therefore, vacated Sawyer's federal convictions on the basis of the improper instructions. *See id.*

5. In the original indictment, the government had charged that the federal mail fraud viola-

tions were based on either the "gift" statute or the "gratuity" statute. The gift statute prohibits, with civil penalties only, a legislative agent to accept gifts in the amount of $100 or more per year. *See* Mass.Gen.L. ch. 268B, § 6. The gratuity statute prohibits, with both criminal and civil penalties, anyone from giving to a legislator anything of substantial value "for or because of any official act performed or to be performed." *See* Mass. Gen.L. ch. 268A, § 3.

6. At the plea hearing, this Court asked the government, "What is specifically charged in this complaint?" The government replied, "The specific mailing is a letter and a check mailed by the defendant to an individual in Hyannis, Massachusetts which was in furtherance of the mail fraud scheme." The Court then asked, "What is the evidence, briefly, that would support the alleged fraud with respect to that mailing?" The government

the Plea Hearing, the government neither offered any evidence, nor alleged that a link existed between the gratuities given and any specific, identifiable, official act of any member of the Massachusetts Legislature. *See id.*

This Court then accepted Sawyer's plea, and sentenced him to a term of one year of probation and a $5,000 fine. *See id.* at 7. At the Plea Hearing, however, this Court noted with great concern and disdain that this case demonstrated a "threat to liberty and the reputation of individuals." *See id.* at 9. This Court strongly cautioned against the "selective transformation of state laws, administered by the Massachusetts State Ethics Commission, and typically enforced by the imposition of civil penalties, into a serious federal felony under the broad language and elastic interpretation of the federal criminal fraud statute." *Id.* This Court noted that Sawyer's prosecution illustrated the "innovative prosecutorial process called the federalization of state laws." *See id.*

This Court continued, "the threat is exacerbated here because this federalized prosecution is applied for the first and only time against a state lobbyist who is not himself a public official.... The fact that even the government acknowledges that criminal fraud was not intended here is established in my mind by the fact that after this [long] and tortuous ordeal they are able to enter into a plea ... to one count of ... mailing in furtherance of the fraud in the amount of about $183. Does this result justify the long ordeal that this defendant has undergone? I don't think so." *Id.* at 10–11. After the plea was entered, Sawyer paid his fine and served the one year sentence of probation.

replied, "From 1986 through 1993, the defendant gave illegal *gratuities* in the form of free golf and other entertainment to Massachusetts legislators." The government continued, "*these illegal gratuities form the basis of the charge...* The mailing consists of a letter and a check from the defendant to an individual for payment of the golf and other entertainment."

Over two years later, the United States Supreme Court issued a decisive opinion concerning the federal gratuity statute, 18 U.S.C. § 201(c). *See United States v. Sun–Diamond Growers of California,* 526 U.S. 398, 119 S.Ct. 1402, 1411, 143 L.Ed.2d 576, (1999). Specifically, the Supreme Court held that in order to establish a violation of the *federal* gratuity statute, the government must prove a specific link between the "gratuity" conferred upon a public official and a particular, identifiable, "official act for or because of which it was given." *See id.*

Subsequently, on July 2, 1999, Sawyer filed the instant Writ of Error Coram Nobis pursuant to 28 U.S.C. § 1651. Sawyer seeks to vacate his prior conviction and expunge his record on the basis that the Supreme Court decision in *Sun–Diamond* constitutes a substantial intervening change in the law rendering his plea invalid.

## II. *CORAM NOBIS*

### A. *History of Coram Nobis*

As early as the sixteenth century, writs of error coram nobis were developed at common law to relieve litigants from judicial wrongs for which there was no remedy. *See* Romualdo P. Eclavea, Annotation, *Availability Under 28 U.S.C. § 1651 of Writ of Error Coram Nobis to Vacate Federal Conviction where Sentence has been Served,* 38 A.L.R.Fed. 617 (1978). Originally, these writs were used to allow courts to correct only their own errors of fact in extremely limited situations. *See id.* In 1946, Congress abolished the common law writ of error coram nobis in civil cases when it adopted an amendment to Federal Rule of Civil Procedure 60(b).[7] *See* Fed.

7. Rule 60(b) provides the modern vehicle for relief from judgment based on mistake, inadvertence, neglect, newly discovered evidence, fraud, etc. The Rule states specifically that, "writs of coram nobis ... are abolished, and the procedure for obtaining any relief from a judgment shall be by motion as prescribed in

R.Civ.P. 60(b). In 1954, the United States Supreme Court clarified that Rule 60(b) did not completely abolish coram nobis; it was still available in limited circumstances for criminal cases. *See United States v. Morgan,* 346 U.S. 502, 511, 74 S.Ct. 247, 252, 98 L.Ed. 248 (1954).

■ Although the ancient writ of coram nobis is not specifically authorized by any statute enacted by Congress, the power to grant such relief comes from the All Writs section of the Judicial Code.[8] *See Morgan,* 346 U.S. at 506, 74 S.Ct. at 250. The Supreme Court noted that the writ of error coram nobis has had a continuous use in the laws of this nation. *See Morgan,* 346 U.S. at 507, 74 S.Ct. at 250. Thus, the District Court has the power, in criminal cases, to grant this extraordinary remedy after a final judgment "only under such circumstances compelling such action to achieve justice." *See Morgan,* 346 U.S. at 511, 74 S.Ct. at 252. Relief in the form of corum nobis is appropriate because, although a sentence has been served, the results of the conviction may persist. *See Morgan,* 346 U.S. at 512–13, 74 S.Ct. at 253. Subsequent convictions may carry heavier penalties and civil rights may be affected. *Id.* Thus, the Supreme Court

specifically indicated that a criminally convicted petitioner is entitled to show that a conviction was invalid, and remedy the invalid sentence.[9] *Id.*

### B. Scope of Coram Nobis

■ A writ of error coram nobis is available under 28 U.S.C. § 1651 to vacate a federal conviction, the sentence on which has already been served. *See Morgan,* 346 U.S. at 511, 74 S.Ct. at 252; *see also Hager v. United States,* 993 F.2d 4, 5 (1st Cir.1993) (coram nobis is an unusual legal animal used to set aside a criminal conviction); *United States v. Holder,* 936 F.2d 1, 2 (1st Cir.1991) (coram nobis is still available in criminal proceedings); *United States v. Michaud,* 925 F.2d 37, 39 (1st Cir.1991) (coram nobis may be used to vacate convictions where errors of a fundamental character render the proceeding itself irregular and invalid). Coram nobis may be granted, therefore, where circumstances compel such action to achieve justice, such as the correction of errors of a fundamental character which render the court proceeding invalid.[10] *See Morgan,* 346 U.S. at 511–12, 74 S.Ct. at 252–53.

■ Although the writ of error coram nobis was available at common law only for

---

these rules or by an independent action." *See* Fed.R.Civ.P. 60(b).

**8.** The All Writs section provides that, "the Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." *See* 28 U.S.C. § 1651.

**9.** The Supreme Court distinguished between relief based in coram nobis and relief based in habeas corpus. Coram nobis "is of the same general character" as habeas corpus. Habeas relief, however, is controlled by 28 U.S.C. § 2255, and applies only to those persons "in custody." Furthermore, habeas corpus relief is a "separate case and record," and is brought under a separate civil proceeding. Coram nobis, controlled by 28 U.S.C. § 1651, is part of the same criminal case from which came the original conviction. This is because relief in coram nobis is "a step in the criminal case" targeted at the validity of the original

conviction itself. *See Morgan,* 346 U.S. at 506 n. 4, 74 S.Ct. 247.

**10.** The government relies on the Supreme Court decision in *Carlisle v. United States* to support its proposition that coram nobis relief is not appropriate in this case. *See* 517 U.S. 416, 429, 116 S.Ct. 1460, 1468, 134 L.Ed.2d 613 (1996). In *Carlisle,* the Supreme Court stated in dicta that coram nobis relief was "traditionally available only to bring before the Court factual errors material to the validity and regularity of the legal proceeding itself." *Id.* The Supreme Court, however, was merely distinguishing between the types of factual errors appropriate for coram nobis relief. It is evident that coram nobis, while traditionally available for factual errors, has been extensively used to remedy legal errors of a fundamental proportion. Furthermore, the Supreme Court declined to apply coram nobis in *Carlisle* on other grounds: a statute other than 28 U.S.C. § 1651 addressed the issue at hand. *See id.*

errors of fact, its modern scope has been expanded to allow relief for fundamental errors of law. *See United States v. Mandel,* 862 F.2d 1067, 1074–75 (4th Cir.1988) (jury instructions rendered invalid after a subsequent Supreme Court decision); *United States v. Loschiavo,* 531 F.2d 659, 666–67 (2nd Cir.1976) (conviction vacated because federal offense "never existed" based on subsequent Supreme Court decision) (citing *Davis v. United States,* 417 U.S. 333, 346, 94 S.Ct. 2298, 2305, 41 L.Ed.2d 109 (1974)); *Cardall v. United States,* 599 F.Supp. 912, 915 (D.Utah 1984) (coram nobis encompasses "legal errors of a fundamental proportion"); *United States v. Wickham,* 474 F.Supp. 113, 116 (C.D.Cal.1979) (present-day scope of coram nobis is broad enough to encompass "legal errors of a fundamental proportion"). In any case, only the Federal District Court which rendered the judgment of conviction, may grant such writ. *See Tavares v. Massachusetts,* 59 F.Supp.2d 152, 154–55 (D.Mass.1999).

### 1. *Subsequent Applicable Supreme Court Decisions*

■ The modern application of coram nobis pursuant to 28 U.S.C. § 1651 allows for relief in light of legal errors, including a dispositive change in the law created by a subsequent decision of the United States Supreme Court. *See Mandel,* 862 F.2d at 1074–75 (vacating a federal mail fraud conviction based on a subsequent Supreme Court decision); *Loschiavo,* 531 F.2d at 666–67 (vacating a federal bribery conviction based on a subsequent Supreme Court decision); *United States v. Travers,* 514 F.2d 1171, 1175–76 (2nd Cir.1974) (vacating a federal mail fraud conviction based on a subsequent Supreme Court decision); *DeCecco v. United States,* 485 F.2d 372, 373 (1st Cir.1973) (vacating a federal tax conviction based on a subsequent Supreme

Court decision); *United States v. Lewis,* 478 F.2d 835, 836 (5th Cir.1973) (vacating a federal tax conviction based on a subsequent Supreme Court decision).

■ As an initial matter, this Court must decide if the Supreme Court decision in *United States v. Sun–Diamond Growers of California* may even be considered as a basis for collateral attack upon a conviction. This Court may not consider *Sun–Diamond* as a basis for collateral attack if the petition is precluded by the retroactivity rule of *Teague v. Lane,* 489 U.S. 288, 309, 109 S.Ct. 1060, 1074, 103 L.Ed.2d 334 (1989). The general premise of *Teague* is that any constitutional rule decided by the Supreme Court after a petitioner's conviction has become final may *not* be the basis for vacating that conviction through habeas corpus, 28 U.S.C. § 2255.[11] *See* 489 U.S. at 309, 109 S.Ct. at 1074; *see also Moore v. Ponte,* 186 F.3d 26, 34–35 (1st Cir.1999). This prohibition applies similarly to post-conviction collateral attacks made by a writ of error coram nobis. *See United States v. Swindall,* 107 F.3d 831, 834 (11th Cir.1997).

### 2. *Retroactivity and Teague Analysis*

A three-step inquiry is used in order to determine if a claim is *Teague*-barred. First, this Court must determine whether petitioner's conviction became final before the subsequent Supreme Court case was decided; if not, the subsequent decision may be used to collaterally attack the conviction. Second, if the conviction *was* final before the subsequent decision was announced, this Court must determine whether the rule announced was a "new" rule; if not, the subsequent decision may be used to collaterally attack the conviction. Finally, even if (1) the decision was announced after the conviction became final, and (2) the decision announced a

**11.** This rule is generally applied to collateral habeas corpus attacks on federal and state convictions. The Supreme Court explained that the application of constitutional rules not in existence at the time a conviction became

final seriously undermines the principle of finality which is essential to the operation of our legal justice system. *See Teague,* 489 U.S. at 309, 109 S.Ct. at 1074.

"new" rule—the rule may fit into one of two specific exceptions to the *Teague* inquiry. If the rule fits one of the two exceptions, then the subsequent decision may be used to collaterally attack the conviction. *See* 489 U.S. at 305–10, 109 S.Ct. at 1073–75; *Moore*, 186 F.3d at 34–35.

A conviction becomes final when the availability of direct appeal is exhausted, and the time for a petition for certiorari has elapsed or been denied. *See Teague*, 489 U.S. at 295, 109 S.Ct. at 1067. There is no doubt that Sawyer's conviction was final before the subsequent Supreme Court decision was announced: Sawyer had already completed his sentence when the Supreme Court announced its decision in *Sun–Diamond.*

█ A new rule is one that "breaks new ground or imposes a new obligation on the States or Federal Government." *See Teague*, 489 U.S. at 301, 109 S.Ct. at 1070. The Supreme Court announces a new rule if "the result was not dictated by precedent existing at the time the defendant's conviction became final." *Id.* In other words, if the conviction was based on a reasonable, good-faith interpretation of then-existing precedent, *Teague* bars collateral attack by a subsequent Supreme Court decision which announces a new rule. *See Moore*, 186 F.3d at 35. However, the Supreme Court has indicated that only rules of constitutional import, not the interpretation of criminal statutes, are barred from retroactive application. *See Bousley v. United States*, 523 U.S. 614, 620, 118 S.Ct. 1604, 1610, 140 L.Ed.2d 828 (1998).

█ The rule announced in *Sun–Diamond* is that in order to establish a violation of the federal gratuity law, 18 U.S.C. § 201(c)(1)(A), the government must prove an actual link between a gratuity and a "specific official act" for or because of which it was given. *See* 526 U.S. 398, 119 S.Ct. at 1411. This interpretation was unsettled at the time Sawyer appealed his original counts of mail fraud based on the state gratuity statute. *See Sawyer*, 85 F.3d at 735–738. The First Circuit noted at the time that the government "relied on cases interpreting the similarly worded federal gratuity statute, 18 U.S.C. § 201(c), that indicate a conviction under that statute does not require a showing that the gratuity was linked to a specific official act." *See id.* at 737. However, at the time of Sawyer's conviction, neither the Supreme Court nor the First Circuit had expressly ruled on the question of whether or not prosecution under the federal statute required proof of a causal relation to any specific identifiable act. *See id.* at 737–38. Because this area of law was unsettled, the First Circuit relied on analogous state and federal statutes, as well as state ethics commission pronouncements. *See id.*

As such, the holding announced in *Sun–Diamond* was merely the clarification of an unresolved area of law in the First Circuit. The decision did not break new ground or impose any new obligations. *See* 526 U.S. 398, 119 S.Ct. at 1411. In fact, the Supreme Court continuously refers to the *Sun–Diamond* holding as merely the "interpretation of the statute," and declines to refer to the decision as any form of "new" rule. The holding in *Sun–Diamond* is neither a constitutional claim, nor a "new" rule as envisioned by the *Teague* inquiry. Thus, the petitioner may rely on its holding as a basis of collateral attack of his conviction.[12]

12. Even if the holding in *Sun–Diamond* were considered a "new" rule, the petitioner would still be entitled to rely on the decision as a basis for coram nobis relief based on an exception to *Teague*. One of the two exceptions to the *Teague* prohibition is when the new rule places a class of conduct beyond the power of the government to proscribe or to address a substantive categorical guarantee. *See Teague*, 489 U.S. at 311, 109 S.Ct. at 1075. In other words, *Teague* does not prohibit a convicted petitioner from using a subsequent Supreme Court decision which removes a class of defendants from a certain type of punishment. *See Sawyer v. Smith*, 497 U.S. 227, 241, 110 S.Ct. 2822, 2831, 111

### 3. Coram Nobis and Plea Convictions

■ The government contends that a writ of error coram nobis is inappropriate in cases, like this, where the defendant has pled guilty to a criminal offense. It is true that generally, a "voluntary and intelligent plea of guilty" may not be collaterally attacked. See Bousley, 523 U.S. at 620, 118 S.Ct. at 1611. However, where the prosecution of a defendant was for an act which was not criminal, or was barred by the Constitution, than a plea of guilty can never be properly informed or voluntary. Cf. Boykin v. Alabama, 395 U.S. 238, 243, 89 S.Ct. 1709, 1712, 23 L.Ed.2d 274 (1969). A guilty plea is subject to collateral attack if it can be shown that the error "has probably resulted in the conviction of one who is actually innocent." See Bousley, 523 U.S. at 620, 118 S.Ct. at 1611.

■ That a guilty plea may be vacated due to a subsequent Supreme Court decision through the writ of coram nobis is well supported in federal law. Lewis, 478 F.2d at 836 (vacating plea-conviction due to subsequent Supreme Court decision), DeCecco, 485 F.2d at 374 (vacating plea-conviction due to subsequent Supreme Court decision); United States v. Aversa, 762 F.Supp. 441, 448 (D.N.H.1991) (applying coram nobis analysis to plea-conviction, but declining to vacate on other grounds); Lawson v. United States, 397 F.Supp. 370, 371 (N.D.Ga.1975) (vacating plea-conviction due to subsequent Supreme Court decision); United States v. Russo, 358 F.Supp. 436, 438 (D.N.J.1973) (vacating plea-conviction due to subsequent Supreme Court decision); United States v. Summa, 362 F.Supp. 1177, 1179 (D.Conn.1972) (va-

cating plea-conviction due to subsequent Supreme Court decision). These decisions support the similar premise in Bousley, that a guilty plea is invalid if the acts of the defendant are not made criminal. See 523 U.S. at 620, 118 S.Ct. at 1611.

For these reasons, Sawyer is entitled to collaterally attack the validity of his guilty plea, and thus his conviction, through the writ of error coram nobis.

### III. DISCUSSION: SAWYER AND THE SUN–DIAMOND DECISION

Having decided that (1) a writ of error coram nobis pursuant to 28 U.S.C. § 1651 is a proper mechanism for relief in this case, (2) the scope of coram nobis encompasses fundamental legal errors based on subsequent Supreme Court decisions, (3) the interpretation of the federal gratuity statute in Sun–Diamond may be applied retroactively in this case, and (4) petitioner may collaterally attack a guilty plea decision on this basis, this Court now turns to the merits of Sawyer's argument.

Sawyer's argument is represented by the following chain of logic: (1) Sawyer pled guilty and was convicted of federal honest services mail fraud, 18 U.S.C. §§ 1341, 1346, (2) proof of violation of the Massachusetts gratuity statute, Mass. Gen.L. ch. 268A, § 3, was an essential element of his conviction, (3) at the time of his conviction, both the Federal District and First Circuit Court of Appeals held that no link need be proven between the gratuity and a "specific official act" for or because of which it was given, (4) at the time of his conviction, the government nev-

---

L.Ed.2d 193 (1990). The Supreme Court has also distinguished "new rules" from decisions which merely interpret substantive federal criminal statutes. See Bousley, 523 U.S. at 620, 118 S.Ct. at 1610. The latter place conduct beyond the power of the criminal lawmaking authority to proscribe. See id. Without allowing the retroactive application of these statutory interpretive decisions, there is a significant risk that a defendant stands convicted of "an act that the law does not make criminal." See Davis v. United States, 417

U.S. 333, 346, 94 S.Ct. 2298, 2305, 41 L.Ed.2d 109 (1974).

The holding of Sun–Diamond does just that: it interprets the federal gratuity statute, 18 U.S.C. § 201(c)(1)(A), more narrowly, thus refusing to read the statute "as a prohibition of gifts given by reason of the donee's office." See 526 U.S. 398, 119 S.Ct. at 1408. The Sun–Diamond holding, therefore, removes this possible class of defendants from prosecution under the federal gratuity statute.

er showed or even alleged that such a link existed, (5) subsequently, the United States Supreme Court, in *Sun–Diamond*, held that this link *is required* in order to establish a violation of the similarly-worded federal gratuity statute, (6) the Massachusetts gratuity statute should be interpreted in the same manner as the federal statute, (7) the government, therefore, never established, nor even alleged, an essential element of his conviction, (8) Sawyer, therefore, was convicted of an act which is not made criminal, (9) the conviction should be vacated in this compelling circumstance in order to achieve justice.

### A. Sawyer's Plea and Conviction

Sawyer pled guilty and was convicted on a one-count information of honest services mail fraud under 18 U.S.C. §§ 1341, 1346.[13] *See Sawyer*, Criminal No. 96–10312–EFH, Plea Hearing at 5. The government charged that Sawyer engaged in a scheme to deprive the Commonwealth of Massachusetts and its citizens of the right to the honest services of their state legislators, and used the federal mails in furtherance of this scheme.[14] In order to prove mail fraud, the government would have had to prove, beyond a reasonable doubt, (1) defendant's knowing and willing partic-

ipation in a scheme or artifice to defraud with the specific intent to defraud or deceive the public, and (2) the use of the mails in furtherance of this scheme. *See Sawyer*, 85 F.3d at 723. In order to establish honest services mail fraud, the government must establish that the conduct actually deprives the public of its right to honest services. *See id.* at 725. The government, therefore, would have had to prove that the target of the scheme was the deprivation of the honest services of the Massachusetts Legislature. *See id.*

It was well accepted, therefore, prior to Sawyer's Plea Hearing, that "the government sought to establish this scheme by proving that Sawyer intentionally violated, or caused members of the legislature to violate" one or both of two Massachusetts statutes. *See id.* at 725. In this case, thus, the government was *required to prove that Sawyer violated at least one state law. See id.* at 726. That the conviction would stand or fall on the basis of proof of the state statute violation was a fact understood by the parties, the original District Court Judge, the Circuit Court of Appeals, and this Court at the time of the Plea Hearing. *See Sawyer*, 878 F.Supp. at 286 ("all of those counts are based ... on

**13.** Section 1341 defines the crime of federal mail fraud. "Whoever, having devised or intending to devise any scheme or artifice to defraud ... for the purpose of executing such scheme or artifice or attempting to do so, places in any post office ... any matter or thing whatever to be sent or delivered by the Postal Service ... shall be fined not more than $1,000 or imprisoned not more than five years, or both." *See* 18 U.S.C. § 1341. Section 1346 expands the definition of "scheme or artifice to defraud" to include "a scheme or artifice to deprive another of the intangible right of honest services." *See* 18 U.S.C. § 1346. Section 1346 was enacted by Congress in response to the Supreme Court's decision in *McNally v. United States. See* 483 U.S. 350, 359, 107 S.Ct. 2875, 2881, 97 L.Ed.2d 292 (1987). *McNally* specifically held that the federal mail fraud statute itself, 18 U.S.C. § 1341, did not prohibit schemes to defraud citizens of their intangible right to honest government services. *See id.* In effect, Section 1346 was enacted to overturn

the *McNally* decision, and reinstate the reasoning of previous case law holding that the mail fraud statute does reach schemes to defraud citizens of the intangible right to honest government services. *See Sawyer*, 85 F.3d at 723–24.

**14.** According to the information, the members of the Massachusetts Legislature owed a duty of honest services to the Commonwealth of Massachusetts and its citizens. This duty of honest services included an obligation to perform their jobs as members of the Massachusetts Legislature free from deceit, fraud, dishonesty, and self-enrichment. *See Sawyer*, Criminal No. 96–10312–EFH, Information at 1–2. This Circuit has recognized that Congress may protect the integrity of the interstate mails by forbidding their use in furtherance of schemes to defraud a state and its citizens of the honest services of its legislators, whether or not it can forbid the scheme itself. *See Sawyer*, 85 F.3d at 722.

Sawyer's alleged violation of the Massachusetts unlawful gratuities statute"); *Sawyer*, 85 F.3d at 726 ("the state laws in question had to be correctly charged as a matter of state law, and the violation of at least one had to be proven"); *Sawyer*, 85 F.3d at 727 ("the government affirmed that it chose the state law violations as the sole vehicle to prove the scheme or artifice to defraud"); *Sawyer*, Criminal No. 96–10312–EFH, Plea Hearing at 5 ("these illegal gratuities form the basis of the charge in Count One of the information").

Under the original indictment, the two Massachusetts statutes which could have formed the basis of the federal mail fraud charge were the "gift" statute and the "gratuity" statute. Under the original indictment, the government contended that Sawyer deprived state citizens of the honest services of state legislators through the violation of either of these laws. *See Sawyer*, 85 F.3d at 726. The government now argues that the Massachusetts gratuity statute was neither charged in the information, nor mentioned during the Plea Hearing. As such, the government claims that Sawyer "stands independently convicted of federal honest services mail fraud ... regardless of whether he also may have violated the [state] statute." *See Sawyer*, Criminal No. 96–10312–EFH, Government's Memorandum in Opposition at 16. It is true that Sawyer pled guilty to one count of federal honest services mail fraud, 18 U.S.C. §§ 1341, 1346. *See id.*, Plea Hearing at 5.

A plea of guilty, however, does not negate the underlying basis for a criminal charge. The state law violations were the "sole vehicle" by which the government sought to prove the scheme or artifice to defraud under the federal mail fraud statute. *See Sawyer*, 85 F.3d at 727. In fact, the government *did* state, on multiple occasions during the Plea Hearing, that the *gratuities* formed the basis of the federal mail fraud charge. The government specifically contended that "the defendant gave illegal *gratuities* in the form of free golf ... [t]hese illegal *gratuities* form[ed] the basis of the charge in Count One of the information." *See Sawyer*, Criminal No. 96–10312–EFH, Plea Hearing at 5. Mindful of the fact that a violation of the state gift statute could not, by itself, serve as a per se basis for a federal mail fraud conviction, the government relied on the state gratuity statute as the "sole vehicle to prove the scheme or artifice to defraud." [15] *See Sawyer*, 85 F.3d at 727.

The government cannot now contend that the guilty plea and conviction was *not* based on the state gratuity statute, when the records of the previous District Court decision, Circuit Court decision, and Plea Hearing are clearly to the contrary. It was abundantly clear, at the time of the Plea Hearing, that both the indictment and the information, required the government to prove that Sawyer violated state law. *See id.* at 726. In order for Sawyer's federal mail fraud conviction to stand, his acts must violate the state gratuity statute

---

**15.** For a variety of reasons, it is clear that the government did not rely on the state gift statute during the Plea Hearing. First, throughout case decisions, documents, and memoranda, the government consistently distinguishes between "gifts" and "gratuities." At the Plea Hearing, however, the government cited only the "illegal gratuities" as the basis for its charge. Second, the Court of Appeals expressly held that a gift statute violation, even if intentional, does not in itself amount to honest services fraud. *See Sawyer*, 85 F.3d at 728. A violation of the Massachusetts gift statute, which is punishable *only* by civil fines, does not *per se* establish honest services mail fraud. *See id.* The Court of Appeals

warned that allowing "every transgression of state governmental obligations to amount to mail fraud would effectively turn every such violation into a federal felony; this cannot be countenanced." *See id.* at 729. Thus, a violation of the state gift statute can never, by itself, serve as the basis for a violation of honest services mail fraud. *See id.* "A gratuity statute violation—unlike a gift statute violation—may itself be sufficient to implicate the duty of honest services." *See id.* Finally, while the state gratuity statute provides for criminal penalties, the state gift statute is allows only civil enforcement. *Compare* Mass. Gen.L. ch. 268B, § 6, *with* Mass.Gen.L. ch. 268A, § 3.

Mass.Gen.L. ch. 268A, § 3. This Court, therefore, must closely examine the *Sun–Diamond* decision, the federal gratuity statute, and its relationship with the Massachusetts state gratuity statute.

## B. *The Sun–Diamond Decision*

■ Sawyer contends that the decision of the United States Supreme Court in *United States v. Sun–Diamond Growers of California* constitutes a substantial intervening change in the federal gratuity law, such as to warrant coram nobis relief. *See* 526 U.S. 398, 119 S.Ct. at 1411. In short, *Sun–Diamond* requires the government to prove an identifiable link between the gratuity and a specific official act for or because of which it was given. *See id.*

In *Sun–Diamond,* the government charged the agricultural trade association with giving the former Secretary of Agriculture, Michael Espy, approximately $5,900 in illegal gratuities in violation of the federal gratuity law, 18 U.S.C. § 201(c)(1)(A).[16] *See* 526 U.S. 398, 119 S.Ct. at 1405. The government alleged that Sun–Diamond had a pecuniary interest in persuading the Secretary to adopt a certain regulatory definition that would enable Sun–Diamond to receive certain grant funds. *See id.* The government also alleged that Sun–Diamond had an interest in seeking the Secretary's assistance in persuading the EPA to abandon a proposed pesticide rule. *See id.*

The federal gratuity statute makes it a crime to "give anything ... of value to any public official ... for or because of any official act." *See* 18 U.S.C. § 201(c)(1)(A). At trial, the District Court instructed the jury that, "[i]t is sufficient if Sun–Diamond provided Espy with unauthorized compensation simply because he held public office ... the government need not prove that the alleged gratuity was linked to a specific or identifiable official act or any act at all." *Id.* The Supreme Court noted that these instructions would allow a conviction for the mere giving of a gratuity to "build a reservoir of goodwill that might ultimately affect one or more of a multitude of unspecified acts." *Id.* 526 U.S. 398, 119 S.Ct. at 1406. Under this view, a conviction would require only a showing that a gift was motivated by the recipient's capacity to exercise governmental power without showing that it was connected to a particular official act. *See id.* at 1407. This interpretation of the federal gratuity statute was wrong. *See id.*

The Supreme Court carefully pointed out that the language of the gratuity statute goes to great lengths to define an "official act." *See* 18 U.S.C. § (a)(3). The insistence upon a gratuity given "for or because of" any official act, carefully defined, seems pregnant with the requirement that some particular act be identified and proved. *See id.* 526 U.S. 398, 119 S.Ct. at 1407. The Supreme Court noted that this is not only the more natural reading of the statute, but the alternative would criminalize mere gifts of goodwill. *See id.* The Supreme Court was concerned that only the Government's discretion would prevent these types of things from being prosecuted. *See id.* 526 U.S. 398, 119 S.Ct. at 1408. The Supreme Court continued, "it seems to us most implausible that Congress intended the language of the gratuity statute ... to pertain to the office, rather than (as the language more naturally suggests) to particular official acts." *Id.*

The Supreme Court concluded that statutes in the field of ethical rules, especially criminal statutes, should reasonably be interpreted as a "scalpel" instead of linguistically interpreted as a "meat axe." *See id.* 526 U.S. 398, 119 S.Ct. at 1410. Not only does the text of the federal gratuity statute require this interpretation, but its more natural reading forbids the alternative result. *Id.* Even though Sun–Dia-

---

**16.** Specifically, the gratuities included tickets to the U.S. Open Tennis Tournament (worth $2,295), luggage (worth $2,427), meals (worth $665), and a framed print and crystal bowl (worth $524). *See Sun–Diamond,* 526 U.S. 398, 119 S.Ct. at 1405.

mond gave the Secretary approximately $5,900 in gratuities, and even though the Secretary was in a position to beneficially affect Sun–Diamond, there was no showing or allegation of an identifiable, specific, official act on the part of the Secretary. *See id.* 526 U.S. 398, 119 S.Ct. at 1405; *see also United States v. Schaffer,* 183 F.3d 833, 844 (D.C.Cir.1999) (to hold otherwise would mean whenever an entity becomes aware of any inchoate government proposal that could affect its interests, and subsequently provides gratuities to a relevant official, it could be held to violate the statute). In order to establish a violation of the federal gratuity statute, therefore, the government must prove a link between the gratuity and a specific, identifiable, "official act" for or because of which it was given. *See id.* 526 U.S. 398, 119 S.Ct. at 1411.

### C. *The State and Federal Gratuity Statutes*

Sawyer argues, therefore, that his federal mail fraud plea-conviction must fail because it was based on an incorrect interpretation of the Massachusetts state gratuity statute. *See id.* 526 U.S. 398, 119 S.Ct. at 1411. Of critical inquiry, therefore, is the extent to which interpretations of the federal gratuity statute should be applied to the state gratuity statute. The relevant portion of the Massachusetts gratuity statute reads,

Whoever otherwise than as provided by law for the proper discharge of official duty, directly or indirectly, gives, offers or promises anything of substantial value to any present or former state, county or municipal employee or member of the judiciary, or to any person selected to be such an employee or member of the judiciary, *for or because of* (emphasis added) any official act performed or to be performed by such an employee or member of the judiciary or person selected to be such an employee or member of the judiciary ... shall be punished by a fine of not more than three

thousand dollars or by imprisonment for not more than two years, or both.

*See* Mass.Gen.L. ch. 268A, § 3.

The relevant portion of the federal gratuity statute reads,

Whoever otherwise than as provided by law for the proper discharge of official duty, directly or indirectly gives, offers, or promises anything of value to any public official, former public official, or person selected to be a public official, *for or because of* (emphasis added) any official act performed or to be performed by such public official, former public official, or person selected to be a public official ... shall be fined under this title or imprisoned for not more than two years, or both.

*See* 18 U.S.C. § 201(c)(1)(A).

At first blush, even an empirical comparison of the two statutes reveals that they are nearly identical. Upon a deeper examination of the Massachusetts statute, this Court discovers even stronger evidence of similarity. The legislative history of Mass.Gen.L. ch. 268A establishes, in no mistakable terms, that the Massachusetts gratuity statute was based on the federal gratuity statute. *See Final Report of the Special Commission Established to Make an Investigation of an Act Establishing a Code of Ethics to Guide Employees and Officials of the Commonwealth in the Performance of Their Duties,* House Doc. No. 3650, at 8 (Mass.1962) ("Legislative History"). The Legislative History explicitly states that "the basic pattern and language of the proposed [gratuity] statute were adopted from the federal bill." *Id.* It is of no small import that the Legislative History specifically warns that, "it should be noted that to constitute a criminal act, the giving or receiving of the item of such substantial value [gratuity] must be for or because of an official act." *Id.*

Both the Federal District Court and the Circuit Court of Appeals aptly noted that this area of law was unsettled at the time of Sawyer's conviction. *See Sawyer,* 878

F.Supp. at 286 ("the courts of Massachusetts have not yet addressed the specific issue of whether [the statute] requires proof that the gratuity was linked to a specific official act"); *Sawyer*, 85 F.3d at 735 ("no Massachusetts court decision has yet interpreted the operative 'for or because of any official act' language in [the statute]"). In their efforts to interpret the state gratuity statute, both the Federal District and Circuit Courts relied on (1) the statutory language, (2) the legislative history, (3) the federal gratuity statute, and (4) state ethics commission pronouncements. *See Sawyer*, 85 F.3d at 735–38; *Sawyer*, 878 F.Supp. at 286–88. The statutory language has not changed; it remains nearly identical to the wording of the federal gratuity statute. A deeper examination of the legislative history of the Massachusetts gratuity statute reveals that it is closely patterned on the federal statute. *See Legislative History* at 8.

Most importantly, however, the interpretation of the federal gratuity statute is clear and settled after *Sun–Diamond*. The government now argues that this Court should not look to *Sun–Diamond* in interpreting the state gratuity statute. This seems disingenuous, however, when prior to Sawyer's conviction, the government, relying on federal cases holding to the contrary, argued that "because much of the Massachusetts gratuity statute's language was based on the federal statute ... a similar interpretation of the state law should obtain." [17] *See Sawyer*, 85 F.3d at 737. Despite the government's argument prior to the conviction, the First Circuit

expressly acknowledged that it had reserved ruling on whether or not a gratuity prosecution under the federal statute required proof of a specific identifiable act. *See id.* The Circuit Court concluded that it was inappropriate to take guidance from an interpretation of the federal gratuity statute where the law in the First Circuit was unsettled.[18] *See id.* at 738.

The law on this matter is no longer unsettled or unclear. The Supreme Court has made it abundantly clear that in order to establish a violation of the federal gratuity statute, 18 U.S.C. § 201(c)(1)(A), the government must establish a link between the gratuity given and a specific, identifiable, official act. *See Sun–Diamond*, 526 U.S. 398, 119 S.Ct. at 1411. There continues to be an absence of any state court decision on this matter. The Supreme Judicial Court of Massachusetts has noted that, "when the [Massachusetts] Legislature, in enacting a statute, adopts the language of a federal statute, we will ordinarily construe the Massachusetts statute in accordance with the construction given the cognate Federal statute by the Federal courts." *See Vasys v. Metropolitan District Commission*, 387 Mass. 51, 54, 438 N.E.2d 836 (1982); *see also Mullin v. Raytheon Co.*, 164 F.3d 696, 705 (1st Cir.1999); *O'Sullivan v. NYNEX Corp.*, 426 Mass. 261, 264, 687 N.E.2d 1241 (1997).

Accordingly, this Court holds that in order to establish a violation of the Massachusetts state gratuity statute, the government must establish a link between the gratuity given, and a specific, identifi-

---

**17.** Prior to the *Sun–Diamond* decision, a number of federal courts had held that the performance of some identifiable, specific, official act was not required as quid pro quo for a violation of the federal gratuity statute. *See, e.g., United States v. Bustamante*, 45 F.3d 933, 940 (5th Cir.1995); *United States v. Standefer*, 610 F.2d 1076, 1080 (3rd Cir.1979); *United States v. Evans*, 572 F.2d 455, 481–82 (5th Cir.1978).

**18.** The First Circuit, in interpreting the state gratuity statute, also turned to pronouncements of the State Ethics Commission which

tended not to require a link between the gratuity and a specific, identifiable, official act. *See Sawyer*, 85 F.3d at 738. The Circuit Court noted that any deference given to these pronouncements was tempered by the fact that (1) no Massachusetts court had ruled on the issue, and (2) the Ethics Commission was charged with civil, not criminal enforcement. *See id.* These pronouncements are now further tempered by the fact that the Supreme Court has now decisively ruled on the similarly-worded federal statute on which the Massachusetts statute was based.

able, official act. Consequently, if Sawyer were prosecuted today, it is evident that a conviction of honest services mail fraud based on a violation of the state gratuity statute would not stand. At no time did the government offer proof of, or even allege, that Sawyer gave gratuities in return for an identifiable, specific, official act. Indeed, most of the government's prior argument concerned the opposite: that conviction did *not* require such a showing. We now know that it does. At the Plea Hearing, the government relied on the gratuities as the sole basis of the charge, without even alleging a link between the gratuities and identifiable, specific, official act. If the Plea Hearing were held today, this Court could not accept a guilty plea; Sawyer's prosecution would be for an act that the law does not make criminal. Sawyer's conviction on November 27, 1996, therefore, was a legal error of fundamental proportion. Despite this fact, however, Sawyer is not automatically entitled to coram nobis relief.

## IV. *ANALYSIS: APPLICATION OF THE CORAM NOBIS STANDARD*

■ This Court has already determined that the act which Sawyer pled guilty to was *not* a violation of 18 U.S.C. §§ 1341, 1346, in light of *Sun–Diamond.* For this Court to grant a writ of error coram nobis and vacate the conviction, however, there must exist circumstances which compel such action to achieve justice. The First Circuit has established a three-part inquiry to determine when circumstances which "compel such action to achieve justice" exist. *See Hager,* 993 F.2d at 5. First, the coram nobis petitioner should explain why he could not earlier seek relief from the judgment. *See id.* Second, the petitioner must show that he continues to suffer significant collateral consequences from the judgment. *See id.* Third, the petitioner must demonstrate that an error of the most fundamental

character relevant to the plea decision occurred. *See id.* Because there is a presumption that a federal conviction is correct or valid, the petitioner has the burden of satisfying the three-part inquiry, and establishing the errors upon which the writ of error coram nobis is based. *See Morgan,* 346 U.S. at 512, 74 S.Ct. at 253.

### A. *Earlier Relief from Judgment*

■ A petitioner seeking coram nobis relief must explain why he did not pursue a timely appeal. *See Hager,* 993 F.2d at 5. Additionally, issues decided on appeal may not be relitigated under a different label on collateral review. *See Michaud,* 925 F.2d at 41 (denying coram nobis relief because allegations were addressed on direct appeal). However, a defendant is not precluded from coram nobis relief based on a subsequent decision of the Supreme Court, if at the time of conviction, an appeal would have been futile based on then existing case law. *See Loschiavo,* 531 F.2d at 665–66 (granting coram nobis and vacating conviction even though the defendant had failed to raise all issues on direct appeal); *see also Mandel,* 862 F.2d at 1075 (granting coram nobis and vacating federal mail fraud conviction even though the defendant appealed his case at each stage, because he had "no other remedy available" other than a writ of error coram nobis). The rule which requires resort to appellate procedure for the correction of errors is not so inflexible that it may not yield to exceptional circumstances where the need for the remedy afforded by coram nobis is apparent. *See* Loschiavo, 531 F.2d at 665–66 (citing *Sunal v. Large,* 332 U.S. 174, 180, 67 S.Ct. 1588, 1591, 91 L.Ed. 1982 (1947)). To say there is no remedy because of a court-made rule that failure to take direct appeal on the specific issue bars all later motions for collateral attack indicates a lack of due process in the judicial system.[19] *See id.* at 666.

In the instant case, Sawyer has served his sentence. He has appealed the issue in

---

19. The Court in *Loschiavo* similarly decided that the defendant was "convicted for a federal offense that did not exist" based on a

subsequent decision of the Supreme Court. *See* 531 F.2d at 665–66. The *Loschiavo* Court applied the simple and universal rule: that a

question at each stage of the proceeding. Sawyer raised this issue at the District Court level, contending that, under the plain language of the statute, the government was required to prove that gratuities were given in exchange for an identifiable, specific, official act. *See Sawyer*, 878 F.Supp. at 286. The District Court noted that the indictment did not even allege that there was such a quid pro quo. *See id.* Similarly, Sawyer raised this issue on appeal prior to conviction. *See Sawyer*, 85 F.3d at 735. At each stage, Sawyer's motion was denied, and the government was not required to prove any link between the gratuity and a specific, identifiable, official act. *See id.* at 738.

Sawyer has demonstrated that he did, in fact, seek prior timely relief from judgment on this issue. It is clear from the record that Sawyer "doggedly and persistently" pursued this issue. The fact that Sawyer did not raise this issue on appeal to the United States Supreme Court is of little consequence. Prior to the conviction, Sawyer had already won his First Circuit appeal on other grounds, and there was no decision from which he could apply for certiorari to the Supreme Court. Thus, any additional pre or post-conviction appeals on this matter would have been futile. In any case, a defendant is not precluded from collateral relief if he has failed to pursue every issue to the bitter end on appeal. *See Loschiavo*, 531 F.2d at 665.

### B. *Significant Collateral Consequences*

■ A petitioner seeking coram nobis relief must make a showing that he contin-

ues to suffer significant collateral consequences from the judgment. *See Hager*, 993 F.2d at 5. The Supreme Court has expressly recognized that, despite having already served the sentence, collateral consequences may persist after a conviction. *See Morgan*, 346 U.S. at 512–13, 74 S.Ct. at 253. Such collateral consequences may include heavier penalties for subsequent convictions, and an imposition on civil rights. *Id.* Other circuits have held that the mere "brand" of criminal is sufficient to warrant coram nobis relief to vacate the conviction.[20] *See Mandel*, 862 F.2d at 1075.

Although the stigma of being branded a criminal may, in itself, be sufficient to justify coram nobis relief, Sawyer clearly suffers additional significant collateral consequences such as to warrant relief. Sawyer's conviction makes it unlawful for him to engage in the business of insurance without written consent of the Commissioner of Insurance. *See* 18 U.S.C. § 1033(e). Additionally, because of the conviction, Hancock Insurance policyholders have brought a derivative action against Sawyer and others.[21] *See Harhen v. Brown*, 46 Mass.App.Ct. 793, 710 N.E.2d 224 (1999). The infringement on Sawyer's ability to work in the insurance industry, the subsequent derivative action, the possibility of higher criminal or civil penalties in the future, and the mere stigma of having been criminally convicted, together constitute significant collateral consequences to allow coram nobis relief. *See Hager*, 993 F.2d at 5.

---

judgment in a criminal case in which the record discloses no evidence of an element of the crime charged is fatally and constitutionally tainted for lack of due process of law. *See id.* at 666. The *Loschiavo* Court noted that if it allowed such a conviction to stand, "the frustration and defeat of justice would be glaringly apparent to the most myopic and obtuse." *See id.* at 667.

20. The Court in *Mandel* noted that "without coram nobis relief, the petitioners, who contested their guilt at each stage of the proceeding, would face the remainder of their lives

branded as criminals simply because their [conviction] occurred before rather than after the Supreme Court's ruling." *See* 862 F.2d at 1075.

21. The policyholders claim that due to the actions of Sawyer, the expenditures, fines, legal fees, and other expenses were paid by the policyholders. *See Harhen*, 46 Mass.App. Ct. 793, 710 N.E.2d 224. This case is currently before the Massachusetts Supreme Judicial Court.

### C. *Fundamental Error*

█ A petitioner seeking coram nobis relief must demonstrate that an error of "the most fundamental character" relevant to the plea decision occurred. *See Hager*, 993 F.2d at 5. This Court has discussed at length why a subsequent Supreme Court decision, creating a dispositive change in the law, is an error of the most fundamental character. *See supra* discussion Parts II and III; *see also Mandel*, 862 F.2d at 1075; *Loschiavo*, 531 F.2d at 665–66; *Travers*, 514 F.2d at 1176; *Lewis*, 478 F.2d at 836; *DeCecco*, 485 F.2d at 373; *Lawson v. U.S.*, 397 F.Supp. at 371; *Russo*, 358 F.Supp. at 438; *Summa*, 362 F.Supp. at 1179. Additionally, most similar cases which have denied coram nobis relief have done so on other grounds. *See, e.g., Hager*, 993 F.2d at 5 (coram nobis denied because defendant did not show significant collateral consequences); *Michaud*, 925 F.2d at 41 (coram nobis denied because legal allegations were disposed of on appeal, and there was no subsequent Supreme Court decision); *Tavares*, 59 F.Supp.2d 152, 154–55 (D.Mass.1999) (coram nobis denied because of lack of jurisdiction); *Tran*, 45 F.Supp.2d 157, 161 (coram nobis denied because defendant had other legal mechanisms available to address the issue); *Aversa*, 762 F.Supp. at 448 (coram nobis denied because appeal was still available to correct error).

Finally, this Court re-emphasizes the threat to the liberty and reputation of individuals which occurs when federal prosecutors selectively transform state ethics violations, administered by the Massachusetts State Ethics Commission, and typically enforced by the imposition of civil penalties, into serious federal felonies. *See Sawyer*, Criminal No. 96–10312–EFH, Plea Hearing at 7. The government should be wary of the broad language and elastic interpretation of the federal criminal fraud statute, and refuse to engage in the innovative prosecutorial process of "federalization" of state laws. This Court noted at the Plea Hearing that Sawyer's federalized prosecution is applied for the first and only time against a state lobbyist who is not himself a public official. *See id.* Indeed, the Court of Appeals recognized that prosecutions on facts like these have not generally been brought. *See Sawyer*, 85 F.3d at 741. The Court of Appeals also recognized that the federal mail fraud statute is increasingly used to convict for underlying claims, and that the use of the federal mails is merely a "jurisdictional hook" to bring the conduct within the proscription of the mail fraud statute. *See id.* at 723 n. 5.

At the time of the Plea Hearing, this Court was concerned about a fundamental principle of criminal law: that criminal statutes must be strictly, not expansively, construed. *See Sawyer*, Criminal No. 96–10312–EFH, Plea Hearing at 7. If this fundamental principle is not scrupulously followed, the personal liberty of even honest citizens is in peril. A defendant must be plainly apprised in advance that his conduct is criminal so that he can possess the requisite criminal intent necessary to be branded a felon. The United States Supreme Court reiterated this concern in *Sun–Diamond*, when it concluded that statutes in the field of ethical rules, especially criminal statutes, should reasonably be interpreted as a "scalpel" instead of linguistically interpreted as a "meat axe." *See* 526 U.S. 398, 119 S.Ct. at 1410. Sawyer's conduct was not very different from the "kind of routine cultivation of friendship." *See Sawyer*, 85 F.3d at 741. In fact, the practice of using hospitality, including lavish hospitality, to cultivate business or political relationships is longstanding and pervasive. *See id.*

Massachusetts prosecutors have never pursued criminal charges for violations against anyone similarly situated to Sawyer. Furthermore, Massachusetts "has, to a large degree, left implementation of Mass.Gen.L. ch. 268 to the State Ethics Commission as a civil regulatory matter." *See United States v. Ferber*, 966 F.Supp. 90, 105 (D.Mass.1997). Massachusetts ap-

pears to have made a policy decision not to criminally prosecute violations of the gratuity statute in cases such as the one at bar. *Id.* It is worth noting that federal prosecutors should avoid relying on obscure or strained interpretations of state law in order to commence a federal prosecution. *Id.* at 106. It is state, not federal, prosecutors who are charged with deciding the manner in which state criminal laws are to be enforced. *See id.*

As stated earlier, if Sawyer were prosecuted today, it is evident that a conviction of honest services mail fraud based on a violation of the state gratuity statute would not stand. Sawyer's prosecution would be for an act that the law does not make criminal. A judgment in a criminal case in which the record discloses no evidence of an element of the crime charged is fatally and constitutionally tainted for lack of due process of law. Sawyer's guilty plea and conviction, therefore, was a legal error of fundamental proportion. For a person to be branded a felon for an act which is not criminal corrupts the very heart of due process.

## V. CONCLUSION

Based on the factors discussed above, Sawyer is entitled to a Writ of Error Coram Nobis. As such, his conviction of November 27, 1996 is hereby vacated, and his record expunged.

SO ORDERED.